## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| INTERVARSITY CHRISTIAN FELLOWSHIP/USA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BOARD OF GOVERNORS OF WAYNE STATE UNIVERSITY, *et al.*, <br><br> *Defendants*. | Civil Action No. 3:19-cv-10375-RHC-SDD <br> Judge Robert H. Cleland <br><br> **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION** <br><br> **ORAL ARGUMENT REQUESTED** |

Pursuant to Federal Rules of Civil Procedure 56 and 65, Plaintiffs InterVarsity Christian Fellowship/USA and InterVarsity Christian Fellowship Wayne State University Chapter (collectively, "InterVarsity") move for partial summary judgment and a permanent injunction on the following claims:

## I. Defendants' interference in InterVarsity's leadership selection violated the Religion Clauses (Counts 1-2).

InterVarsity is a religious group whose mission is marked by clear and obvious religious characteristics, and its officers are its religious leaders who minister to its members, personify its beliefs, and are important in conveying InterVarsity's religious message and carrying out its religious mission. Defendants accordingly violated InterVarsity's clearly established rights under the Free Exercise Clause to shape its own faith and mission through its appointments of leaders, and its Establishment Clause right against government entanglement in the same.

1

## II. Defendants violated the First Amendment by discriminating against InterVarsity.

### A. Defendants infringed InterVarsity's free speech rights (Counts 7-8).

Defendants prevented InterVarsity from accessing a forum for speech, and their restriction is both unreasonable in light of the forum's purposes and discriminates against InterVarsity based on its religious viewpoint.

### B. Defendants infringed InterVarsity's association and assembly rights (Counts 6, 9).

InterVarsity is an expressive association, and Defendants prevented InterVarsity from associating with leaders who agree with and can express its religious viewpoints with integrity, which significantly affects InterVarsity's ability to express its viewpoints. Moreover, Defendants prevented InterVarsity from peaceably assembling with persons of their choosing to engage in otherwise lawful religious worship and speech activities.

### C. Defendants infringed InterVarsity's free exercise rights (Counts 3-4).

Defendants violated the Free Exercise Clause by discriminating against InterVarsity based on its sincere religious beliefs and religious exercise in a manner that is not neutral or generally applicable.

### D. Defendants violated the Establishment Clause (Count 5).

Defendants impermissibly discriminated based on religion, penalizing InterVarsity because of its religious beliefs even as it registered other religious groups on campus with analogous leadership policies.

### E. Defendants' discrimination against InterVarsity fails strict scrutiny.

Defendants have not and cannot prove that their infringements on InterVarsity's First Amendment rights are the least restrictive means of satisfying a compelling

government interest, and thus have violated those rights under clearly established federal law.

### III. Defendants violated the Freedom of Worship and Religious Belief Clause of the Michigan Constitution (Count 15).[1]

Defendants' action burdened InterVarsity's sincerely held religious beliefs, and Defendants cannot show that any compelling state interest justifies the burden or that its action was the least restrictive means of furthering any such interest.

### IV. The Court should grant permanent injunctive relief.

Given Defendants' First Amendment violations, a permanent injunction is required. The loss of First Amendment freedoms constitutes irreparable harm, and vindicating those freedoms is in the public interest.

IN SUPPORT OF THIS MOTION, InterVarsity has attached a Brief in Support of Summary Judgment and several declarations. Per Local Rule 7.1, InterVarsity states that its counsel conferred with Wayne State's counsel and explained the nature of the motion and its legal basis, and did not obtain concurrence in the relief sought.

InterVarsity requests oral argument on this motion.

WHEREFORE, InterVarsity requests that this Court grant summary judgment to InterVarsity on the claims listed above, and:

a. Declare and enter judgment that the First Amendment to the United States Constitution requires Defendants not to discriminate against InterVarsity or withhold registered status on the basis of InterVarsity's religious leadership selection policies;

---

[1] Count 15 was mistakenly labeled "Count 13" in the original complaint.

b.  Declare and enter judgment that Defendants' enforcement of Wayne State's policy against InterVarsity violated InterVarsity's clearly established constitutional rights;

c.  Declare and enter judgment that the individual-capacity Defendants are personally liable for these violations;

d.  Issue a permanent injunction prohibiting enforcement of Wayne State's Non-Discrimination Affirmative Action Policy against InterVarsity based on InterVarsity's religious leadership selection policies;

e.  Award InterVarsity nominal damages, to which it is entitled by law;

f.  and set a trial for the determination of further damages against the individual-capacity Defendants.

Respectfully submitted,

Paul C. Schultz
Mitzel Law Group PLC
1590 Eisenhower Pl.
Ann Arbor, MI 48108-3284
(734) 668-4100 phone
*pschultz@mitzellaw.com*

*/s Daniel H. Blomberg*
Daniel H. Blomberg
Eric S. Baxter
Lori Windham
Christopher Mills
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*dblomberg@becketlaw.org*
*ebaxter@becketlaw.org*

**Counsel for Plaintiffs**

4

## CERTIFICATE OF SERVICE

I, Daniel H. Blomberg, certify that the forgoing document was filed and served via the Court's electronic case filing and noticing system (ECF) this 22nd day of October, 2020, which will automatically send notification of such filing to all attorneys and parties of record registered electronically.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*dblomberg@becketlaw.org*

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| INTERVARSITY CHRISTIAN FELLOWSHIP/USA, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>BOARD OF GOVERNORS OF WAYNE STATE UNIVERSITY, *et al.*,<br><br>    *Defendants*. | Civil Action No.:<br>3:19-cv-10375-RHC-SDD<br>Judge Robert H. Cleland<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED** |

Paul C. Schultz
Mitzel Law Group PLC
1590 Eisenhower Pl.
Ann Arbor, MI 48108-3284
(734) 668-4100 phone
*pschultz@mitzellaw.com*

Daniel H. Blomberg
Eric S. Baxter
Lori Windham
Christopher Mills
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*dblomberg@becketlaw.org*
*ebaxter@becketlaw.org*

***Counsel for Plaintiffs***

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES PRESENTED.....................................................iii

CONTROLLING AND/OR MOST APPROPRIATE AUTHORITIES.................iv

STATEMENT OF MATERIAL FACTS .....................................................v

INTRODUCTION .....................................................1

LEGAL STANDARD.....................................................2

ARGUMENT .....................................................3

I.   Wayne State's interference in InterVarsity's leadership selection
     violated the Religion Clauses (Counts 1-2). ..................................3

     A. InterVarsity is a religious group. .....................................4

     B. InterVarsity's officers hold religious leadership positions.............5

     C. Wayne State impermissibly interfered with InterVarsity's
        religious leadership selection.........................................8

II.  Wayne State violated the First Amendment by discriminating
     against InterVarsity's religious viewpoint. ...........................9

     A. Wayne State infringed InterVarsity's free speech rights (Counts
        7–8). .....................................................9

          1.   Wayne State's refusal to reregister InterVarsity was
               unreasonable in light of the forum's purpose. ...................10

          2.   Wayne State discriminated on the basis of viewpoint. ...........13

          3.   *Martinez* condemns Wayne State's discriminatory actions.........17

     B. Wayne State infringed InterVarsity's association and assembly
        rights (Counts 6, 9). .....................................................18

     C. Wayne State infringed InterVarsity's free exercise rights
        (Counts 3–4). .....................................................20

D.  Under the Establishment Clause, Wayne State's religious preference triggers strict scrutiny (Count 5)....................................................25

E.  Wayne State's discrimination against InterVarsity fails strict scrutiny....................................................................................................26

  1. Wayne State has no compelling interest in penalizing InterVarsity. ....................................................................................26

  2. Wayne State has not employed the least restrictive means available. ...............................................................................29

III.  Wayne State violated the Michigan Constitution (Count 15)..........................31

IV.  This Court should grant permanent injunctive relief. ....................................32

CONCLUSION ...............................................................................................................33

## STATEMENT OF THE ISSUES PRESENTED

1.  Did Defendants violate the Religion Clauses of the First Amendment by interfering in a religious organization's ability to ensure its leaders agree with its religious beliefs?

2.  Did Defendants violate InterVarsity Christian Fellowship's free speech rights by deregistering it for requiring its student leaders to agree with its statement of faith, even while allowing other groups with similar leadership requirements to remain registered?

3.  Did Defendants violate InterVarsity Christian Fellowship's freedom of association and assembly rights by preventing it from selecting leaders who agree with its religious beliefs?

4.  Did Defendants violate the First Amendment's Free Exercise and Establishment Clauses by selectively enforcing a purported non-discrimination policy against InterVarsity Christian Fellowship while exempting many other student organizations from that policy?

5.  Did the individual Defendants violate the Michigan Constitution's guarantees of religious freedom by imposing a substantial burden on InterVarsity Christian Fellowship's religious exercise?

**CONTROLLING AND/OR MOST APPROPRIATE AUTHORITIES**

**Religion Clauses**: *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015).

**Free Speech Clause**: *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010); *Widmar v. Vincent*, 454 U.S. 263 (1981); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960 (S.D. Iowa 2019).

**Free Association & Assembly**: *Dale v. Boy Scouts of Am.*, 530 U.S. 640 (2000); *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006); *Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010); *Thomas v. Collins*, 323 U.S. 516 (1945).

**Free Exercise Clause**: *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012).

**Establishment Clause**: *Larson v. Valente*, 456 U.S. 228 (1982).

**Michigan Constitution**: *McCready v. Hoffius*, 586 N.W.2d 723 (Mich. 1998).

**Permanent Injunction**: *Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2012).

## STATEMENT OF MATERIAL FACTS

### *InterVarsity at Wayne State*

1. Plaintiff InterVarsity Christian Fellowship/USA is a religious organization that conducts religious ministry through chapters on over 600 college campuses across the Country. Beyerlein Decl. [Ex. A] ¶ 4, Ex. A1; Beyerlein Dep. [Ex. F] at 79:7-10.

2. Plaintiff InterVarsity Christian Fellowship at Wayne State University is one of those chapters, and has been a recognized part of the Wayne State community for more than seventy-five years. Villarosa Dep. [Ex. C], Ex. C11 at WSU001717; Blomberg Decl. [Ex. B], Ex. B24 at 10.

3. Both Plaintiffs (collectively, "InterVarsity") share a common purpose: "to establish and advance . . . communities of students and faculty who follow Jesus as Savior and Lord." Ex. A ¶ 5, Ex. A2.

4. At Wayne State, InterVarsity's members meet weekly for religious services and Bible study, engage in outreach and prayer vigils on campus, host campus conferences on religion, and organize projects to serve both Wayne State and the surrounding community. *See, e.g.*, Ex. B21 at 1; Ex. F at 29-31.

5. While membership and participation in InterVarsity is open to everyone, students seeking leadership roles must "indicate their agreement with InterVarsity's Doctrine and Purpose Statements," "exemplify Christ-like character, conduct and leadership," and describe their Christian faith. Ex. 1 to the Garza Decl. [Ex. G] at 2

(InterVarsity Constitution); Ex. C8 at WSU002246; Ex. C11 at WSU001718; Ex. F at 25-26.

6.   Student leaders receive extensive religious training to help them perform their duties, including training on how to lead Bible studies, share InterVarsity's beliefs with others, and follow InterVarsity's doctrine and purpose statements. Ex. F at 113:5-12; Ex. G ¶¶ 10, 14-17; LaRowe Decl. [Ex. H] ¶¶ 5-9.

7.   InterVarsity's constitution expressly defines these students as "Christian Leaders," and their "distinct religious role[s]" necessarily "involve[ ] significant spiritual commitment." Ex. G ¶¶ 9, 11, 19-21; Ex. 1 to the Garza Decl. at 2.

8.   They are the "primary means" through which InterVarsity "ministers on campus," and they have responsibility for leading the group's Bible study, prayer, worship, and acts of service. Ex. G ¶¶ 9, 19-21.

9.   They also organize and lead religious outreach events and prayer vigils, personally provide religious counsel to students, and evaluate the religious qualifications of future leadership candidates. *Id.*; *see* Ex. H ¶¶ 12-15.

***Wayne State's Student Organization Policies***

10.   InterVarsity is a registered student organization, or "RSO," at Wayne State. The RSO program is a longstanding effort by Wayne State to provide a forum that encourages and supports the formation of student organizations centered around common causes and beliefs. Ex. C at 98:4-100:8.

11.   The program has over 500 RSOs, including fraternities and sororities, club sports teams, and other student organizations. Blomberg Decl., Ex. B15 at WSU000637.

12. Through these groups, students band together to celebrate distinct cultures, promote political causes, enjoy unique hobbies, worship together, serve the community, pursue academic excellence, and much more. Ex. C7 at WSU000316; Ex. B15 at WSU000637; *see, e.g.*, Ex. C4 at WSU006642.

13. Wayne State established the program to "enrich[] the campus life experience" and "support student intellectual growth and social maturity." Ex. B15 at WSU000637.

14. The groups are highly valued by Wayne State because they create social and professional networks for students, opportunities for practical application of classroom learning, and a marketplace of ideas where students can grapple with new and challenging concepts—all of which serves to increase the graduation rate, along with creating a diverse and dynamic campus culture. *Id.*; Strauss Dep. [Ex. D] at 121-22.

15. Wayne State encourages participation in the RSO forum by giving significant benefits to student groups that register, including the ability to reserve free meeting space on campus; access free tables in public spaces for student outreach and advocacy; participate in two main recruiting events—FestiFall and WinterFest; appear on the Wayne State webpage; and use University's online OrgSync communication system to connect with students and schedule events. Ex. B15 at WSU000637-38; Ex. D at 115-22.

16. To access the RSO forum and its benefits, a group must submit information about its members, its leaders, and a constitution explaining its purpose and governance. Ex. B15 at WSU000681; Ex. C at 62-63.

17. Once approved, the group must reregister annually. Ex. C at 150:10-14.

18. Reregistration is accomplished by updating student officers' names and contact information and resubmitting the organization's constitution. Ex. B13 at WSU000172-73.

19. Wayne State's Coordinator of Student Life, Ricardo Villarosa, evaluates each submission for completeness and compliance with Wayne State's requirements. Ex. C at 14-15, 26-27, 62. If the submission fails to comply, Villarosa denies the application and explains why. *Id.* The organization can then make corrections and resubmit. *Id.* If it is unclear whether a submission is compliant, Villarosa consults with Dr. David Strauss, the Dean of Students, regarding how to proceed. *Id.* at 28-31.

20. This evaluation includes reviewing whether the organization's leadership and membership criteria violate Wayne State's Non-Discrimination Policy (the "Policy"). *Id.* at 26-27.

21. According to Wayne State, the Policy forbids discrimination on the basis of "race, color, sex (including gender identity), national origin, religion, age, sexual orientation, familial status, marital status, height, weight, disability, or veteran status" in the context of "hiring, terms of employment, tenure, promotion, placement and discharge of employees, admission, training and treatment of students, extracurricular activities, the use of University services, facilities, and the awarding of contracts." Ex. C5 at WSU001371-72.

22. Wayne State claims that there are "no written exceptions" to this Policy. Ex. B9 at 10-11.

23. The Policy itself, however, goes on to say that it "shall not preclude the university from implementing those affirmative action measures which are designed to achieve full equity for minorities and women." Ex. C5 at WSU001371.

### *Wayne State Denies InterVarsity's Reregistration*

24. In early 2017, Wayne State instituted a new online system called OrgSync for approving student organizations. Ex. C at 38:20-22; Ex. C11 at WSU001718.

25. Cristina Garza, InterVarsity's chapter president, submitted the group's constitution through the automated system. *Id.*

26. That constitution was essentially identical to the constitutions InterVarsity had previously submitted, Ex. G ¶ 23, and was the same as InterVarsity constitutions at other Michigan universities such as the University of Michigan, Michigan State University, and Central Michigan University. Ex. C11 at WSU001718; Ex. A ¶ 6.

27. It makes clear that InterVarsity welcomes all students as members, regardless of religious belief, but asks that student leaders embrace InterVarsity's statement of faith. Ex. 1 to the Garza Decl. at 2; Ex. C8 at WSU002246.

28. On March 30, Ms. Garza received an OrgSync message stating that the application had been completed and that her position as president had been accepted. But the following day, Villarosa posted two messages stating "[n]either membership, nor officer requirements may violate the university anti-discrimination policy— please amend the officer requirements accordingly and resubmit." Ex. C8 at WSU002241.

29. Garza initially missed the messages, as she was unfamiliar with the new system, and did not amend the leadership policies. Ex. G ¶ 26.

ix

30. InterVarsity continued to be treated as a registered student organization in spring 2017 and into the start of the fall semester. Ex. G ¶¶ 26-27; Ex. C11 at WSU001718.

31. In September 2017, after Garza renewed InterVarsity's application for that school year, Villarosa asked the organization to contact him regarding its "Membership and Officer Requirements." Ex. C9 at WSU002847; Ex. G ¶ 31.

32. Villarosa informed Garza that InterVarsity's statement of faith for leaders was inconsistent with the school's Policy. Ex. G ¶ 34; Ex. C9 at WSU002847; Ex. C11 at WSU001718.

33. Garza protested that many campus groups, including fraternities and sororities, place restrictions on leadership and membership, and asked for confirmation from the University's general counsel given the harm to InterVarsity's First Amendment rights. Ex. G ¶¶ 35-36; Ex. C11 at WSU001718.

34. Wayne State's assistant general counsel responded via letter, stating that Garza was factually wrong because the Policy "applied equally to all organizations seeking recognition" and was legally wrong because "the policy is viewpoint neutral." Ex. C10 at WSU001716.

35. Villarosa and Strauss both saw this letter. Villarosa knew it was false that WSU applied the Policy "equally" to "all organizations," but neither he nor Strauss sought to set the record straight. Ex. C at 202:1-15; Ex. D at 72:19-21.

36. Just three days later, on October 26, Wayne State officially denied InterVarsity's registration and immediately cancelled all its scheduled room reservations. Ex. G ¶¶ 40-42; Ex. B17 at IVCF Wayne 000041-42.

37. InterVarsity immediately suffered the loss of all RSO benefits, which dramatically injured its ability to participate equally in campus life. Ex. F at 36:3-14; *see* Ex. C at 199:3-15, 200:1-17, 201:1-8.

38. Before terminating InterVarsity's 75-plus years on campus, Wayne State made no effort to consider actions less drastic than complete deregistration. Ex. C at 211:8-212:19, 231:3-232:4.

39. It did not compare policies at other Michigan universities with InterVarsity chapters. *Id.* And it neither evaluated its interests in forbidding InterVarsity from having religious leaders nor tried tailoring its deregistration to those interests. *Id.*

### *Wayne State's Selective Enforcement*

40. Notwithstanding Wayne State's claim that its Policy "is applied equally to all organizations," it has permitted countless registered student organizations, and many of its own programs, to limit participation based on protected characteristics. Ex. C10 at WSU001716.

41. To take an obvious example, Wayne State categorically allows NCAA and club sports teams to discriminate based on sex and gender identity. Ex. C at 156:19-157:3; Ex. B20 at IVCF Wayne 001953; Ex. B11 at 3-4.

42. Indeed, Wayne State's own model constitution for club sports expressly permits such distinctions, Ex. B20 at IVCF Wayne 001953-1955; Ex. D at 150:21-151:2, and many registered club and intramural teams adopt them, *e.g.*, Ex. B16 at WSU004544 (Men's Volleyball Club); Ex. B5 at WSU006648 (row 4) (Women's Club Soccer); Ex. B20 at IVCF Wayne 001938-48 (Intramural Sports Handbook).

43. Wayne State admits that club teams can discriminate on sex and gender identity and still be registered, but says that other organizations imposing the same limitation would be "inconsistent" with the Policy. Ex. D at 148:7-10, 151:17-152:4.

44. Moreover, Wayne State also provides an unwritten categorical exemption to single-sex social fraternities and sororities. Ex. D at 138:20-21; *see* Ex. C at 136:7-8; Mitchell Dep. [Ex. E] at 59:15-20.

45. "Greek groups at Wayne State control their own membership" and leadership. Ex. E at 35:6-8, 71:14-21, 79:2-4.

46. Their membership policies are "dictated by whatever the national organization says [are] their membership" or "leadership requirement[s]." Ex. E at 35:9-18; *e.g.*, Ex. B6 at WSU006649 (row 6, col. Z) (Alpha Phi Alpha Fraternity, "refer to National Website for Membership Criteria").

47. Many of them limit leadership, membership, participation, and benefits based on sex, and all of them are permitted to do so. Ex. C at 136:13-137:1.

48. Alpha Sigma Phi and Phi Mu Alpha, for example, are limited to male students, Ex. B16 at WSU003540; Ex. B6 at WSU006649 (row 7, col. Z); Ex. B7 at WSU006650 (row 68, col. T), while Alpha Epsilon Phi and Alpha Gamma Delta are limited to female students, Ex. B16 at WSU003259; Ex. B7 at WSU006650 (row 9, col. T); Ex. B16 at WSU003592; Ex. B6 at WSU006649 (row 4, col. C).

49. Many other RSOs also discriminate on bases supposedly forbidden by the Policy, including race, color, national origin, sex, sexual orientation, veteran status, and religion.

50. The Iraqi Student Organization requires every leader to be "a dedicated Iraqi student." Ex. C4 at WSU006642 (row 40, col. V).

51. Anakh Sherniyan Di is an "all-girls competitive Bhangra dance team." Ex. B16 at WSU003952.

52. Queer WSU Students of Color limits leaders to those who show "dedication to the program" and have "[e]xperience with QPOC [queer persons of color] or lived experiences as a QPOC"—a facial preference for those with certain sexual orientations and races. Ex. B16 at WSU004108.

53. The WSU Student Veterans Organization limits full membership and leadership to veterans, their dependents, or ROTC members. Ex. C4 at WSU006642 (row 100, col. T); Ex. C2 at WSU003251; *see* Ex. C at 119:1-8, 120:7-14.

54. The Association of Black Social Workers "is comprised of people of African ancestry" and has the goal of fostering "interaction with other individuals of African heritage." Ex. B16 at WSU004408; Ex. B7 at WSU006650 (row 101, col. Q); Ex. B1 at WSU006643 (row 8, cols. Q-T).

55. Many other student groups with religious leadership requirements have also remained registered. The Newman Catholic Center requires leaders to "be Catholic." Ex. C4 at WSU006642 (row 59, col. V).

56. The Muslim Students' Association requires its leaders be "Muslim." Ex. B7 at WSU006650 (row 57, col. V).

57. Christians on Campus limits leadership to those who are "believer[s] in Jesus Christ and uphold the Bible as the complete divine revelation." Ex. B16 at WSU004402; *see* Ex. C4 at WSU006642 (row 23, col. V).[1]

58. Wayne State even registered a church—New Life Church—as a student organization that meets on campus, holds worship services every Sunday, and requires its leaders to "advance the interests of New Life and our purpose." Ex. B1 at WSU006643 (row 40, col. V); *see also* Ex. B16 at WSU003496.

59. Non-religious groups are also permitted to limit leadership *and* membership based on mission alignment—including groups with missions to promote a particular protected class.

60. For example, when the "Reunite and Organize in Spite of Everything" student group submitted its constitution for apparent re-registration, Villarosa did not flag any problem with the group's requirements that members "share with us the goal of African unification" or that leaders "already be actively working in the community to advance the African race." Ex. C3 at WSU001838 (row 86, col. G) (showing ROSE's status as "Current"); Ex. B16 at WSU004794.

---

[1]   *See also* Ex. B3 at WSU006645 (row 8, col. V) (Faholo Campus Ministry; requires leaders to "agree" with certain "denominational faith statements"); Ex. B4 at WSU006647 (row 7, col. T) (Ratio Christi; leaders must "profess a personal relationship with Jesus Christ"); Ex. B1 at WSU006643 (row 46, cols. T-V) (The Eternal Message, members must "work hard to spread its message" and leaders must "follow[] its mission"); Ex. B7 at WSU006650 (row 95, col. V) (Coptic Christian Club; requires leaders to be "Coptic Orthodox Christian"); Ex. B16 at WSU003324 (Virtuous 31; requires its leadership to "really love God").

61. The Wayne African Student Society requires that members "understand and support[]" its "societal goals and purposes." Ex. B16 at WSU004469; Ex. C4 at WSU006642 (row 97, col. T).

62. The Secular Student Alliance, which seeks "[t]o promote secular values," requires that leaders "have shown commitment to the group" and bans members from "preaching." Ex. B16 at WSU004001.

63. The Macedonian-American Student Association requires members to "agree with the goals of the group." Ex. B16 at WSU003926; Ex. B1 at WSU006643 (row 28, col. T).

64. The National Black Operations Business Association limits membership to those who are "passionate about social issues and business topics which effect the black community as a whole." Ex. B16 at WSU003276; Ex. C4 at WSU006642 (row 53, col. T).

65. Wayne State also broadly allows RSOs to discriminate in membership, leadership, participation, and benefits on *any* basis that is not identified in the Policy.

66. Thus, for instance, RSOs may exclude students based on ethnicity, politics, ideology, physical attractiveness, and GPA. Ex. C at 99:19-101:1.

67. To take just two examples from current RSOs, Young Americans for Freedom requires members to agree with its political "principles," Ex. B2 at WSU006644 (row 14, col. T), and the International Youth and Students for Social Equality—whose goal is "to fight for a Marxist perspective at Wayne State University"—requires members and leaders to be "in full agreement with the IYSSE

statement of principles." Ex. B16 at WSU003187; *see* Ex. B7 at WSU006650 (row 39, cols. T, V); Ex. C4 at WSU006642 (row 39, cols. T, V).

68. Finally, Wayne State itself has multiple programs, scholarships, grants, and awards that discriminate against students based on protected characteristics. It concedes that it offers scholarships giving preference to veterans, men, women, students of a certain age or from a specific country, married students, and others. Ex. B12 at 4; *see, e.g.*, Ex. B19 at IVCF Wayne 001447 ("Women of Distinction Awards"); *id.* at 001452 (scholarship favoring LGBT students); Ex. B22 at 003029 (scholarship for students "enrolled and performing in the Men's Glee Club"); *id.* at 003050 (scholarship for students between "the ages of 22 and 37"); *id.* at 003090 (scholarship only for students "from another country"); *id.* at 003105 (tuition waiver "for qualifying Native Americans").

69. Other University programs employ similar distinctions. The "Student Veteran Resource Center" provides veterans with amenities such as private study areas, a lounge with a TV, and a kitchen. Ex. B20 at IVCF Wayne 001790-91.

70. The RISE Learning Community provides special benefits for women of color. Ex. C at 111-113; Ex. C6 at WSU000658; Ex. B22 at IVCF Wayne 003114-15.

71. The "Soul 2 Soul" graduate-student-support group is open only to "graduate students of color." Ex. B19 at IVCF Wayne 001470.

72. And the University provides "women only" spaces on campus, including an entire floor in one building and a portion of the school's gymnasium. Ex. C at 113-15; Ex. C6 at WSU000659.

*Effects of Deregistration on InterVarsity*

73. As an RSO, InterVarsity had regularly reserved a meeting space that was easy to find and spacious, to better attract students and hold various prayer and teaching activities in the same room. Ex. F at 62.

74. But deregistration changed all that. *Id.* at 61:22-63:7.

75. Due to the cost and the priority that RSOs receive in accessing spaces before non-RSO groups, InterVarsity could no longer rent the same space. *Id.*; *id.* at 30:17-31:3.

76. Instead, it was forced to spend thousands of dollars to rent smaller, less accessible rooms, constantly having to switch locations after being forced to the back of the room-rental line. Ex. C11 at WSU001719; Ex. F at 61-63.

77. And InterVarsity had to cut back its on-campus activities because it could not afford to hold as many meetings as usual. *Id.* at 30:14-31:3.

78. Attracting students became harder still, as InterVarsity was neither listed on nor able to communicate through OrgSync (where students normally find RSOs) and could not advertise its meetings or set up tables to meet students like other RSOs. Ex. C11 at WSU001719; Ex. F at 28:18-23; 30-31.

79. Moreover, the stigma of being separated from other student groups came with its own cost. For instance, students asked whether InterVarsity was even a "real" student group. Ex. F at 63:1-2.

80. And at the first major recruiting event post-deregistration (WinterFest), InterVarsity was shut out of the ballroom where RSOs connect with interested

students—a particularly important opportunity given how many of Wayne State's students are commuters. Ex. C at 201:1-3; Ex. F at 35:17-20; Ex. G ¶ 29.

81. Instead, InterVarsity was relegated to "paid" space with outside vendors in a hallway on a floor below the ballroom, where it "missed a lot of the students" looking for organizations to join. Ex. F at 35-36; Ex. G ¶¶ 46-47.

### *This Lawsuit*

82. Tom Lin, the president of InterVarsity USA, sent a letter to Wayne State's president asking him to reconsider the decision to deregister InterVarsity. Ex. C11 at WSU001717.

83. Wayne State's general counsel responded, suggesting that a resolution could take several months and threatening that Wayne State may feel "compelled to take aggressive measures" against InterVarsity. Ex. B23 at 1.

84. InterVarsity then requested provisional reinstatement so that it could participate fully in campus life pending the months-long discussions. Ex. B18 at IVCF Wayne 001065.

85. Wayne State refused. Ex. B18 at IVCF Wayne 001082.

86. Due to Wayne State's refusal to timely reconsider, the mounting rental costs, and significantly diminished access to campus, InterVarsity filed this lawsuit on March 6, 2018.

87. The next day, Wayne State issued a statement defending and reiterating its deregistration decision, explaining that it "took action to decertify" InterVarsity because "it is in violation of the university's non-discrimination policy." Ex. B25 at 1-2.

88. On March 8, 2018, InterVarsity thus informed the Court and Defendants that it would seek a temporary restraining order reinstating InterVarsity. That afternoon, Wayne State modified its position, stating:

> After a review of the situation and communicating with the InterVarsity Christian Fellowship organization, Wayne State has decided to recertify the group as an official student organization. The InterVarsity student group is committed to welcoming and including all students, and the university will not intervene in the group's leadership selection.

Ex. B26 at 2.

89. InterVarsity then re-applied for registered status, and that application was granted. Ex. C at 233:5-11.

90. But Wayne State has not issued any official policy regarding student organizations' leadership requirements, and InterVarsity must reapply for registered status every academic year. *Id.* at 150:10-14, 181:15-82:15, 238:5-239:3.

91. Moreover, the University continues to insist that InterVarsity's leadership criteria still violate the Policy, *id.* at 255:5-10, and that InterVarsity's leadership criteria "make second-class citizens of students who refuse to accept [its] religious pledge." Dkt. 6 at 17, PageID.110.

### *Case Proceedings*

92. Wayne State previously moved to dismiss the complaint in its entirety for failure to state a claim, Dkt. 6, and InterVarsity moved for partial summary judgment, Dkt. 7.

93. After a hearing, this Court denied InterVarsity's motion without prejudice to allow the development of the record and denied Wayne State's motion except as to certain Michigan state law claims. Dkt. 26 at 21, PageID.514.

94. The parties proceeded to discovery, which is now complete.

## INTRODUCTION

This case revolves around a decision by Wayne State University to penalize InterVarsity, a religious student group on campus for seventy-five years, because it requires its leaders to agree with its statement of faith. Wayne State claims this requirement violates its Non-Discrimination Policy, which supposedly forbids discrimination based on various protected characteristics, including religion, without exception. But Wayne State routinely registers student organizations—including other religious organizations—that discriminate on these characteristics, and the University's own programs engage in similar discrimination. InterVarsity, however, was treated differently. Unable to accept leaders who disagree with its religious beliefs, InterVarsity declined to end its longstanding, religiously rooted requirement that its leaders embrace its faith. As a result, Wayne State refused to renew InterVarsity's registration, denying it equal access to recruit students at campus fairs, be listed on Wayne State's student-group website, use campus resources, and otherwise participate fully in campus life.

Wayne State's actions contravene well-established law, including multiple First Amendment guarantees. Wayne State has applied its Policy in a way that discriminates based on viewpoint, is not neutral, and demonstrates religious favoritism. Dozens of other registered student organizations on campus have been allowed to screen leaders *and* members based on conformity not just with a group's particular beliefs, but even directly based on a protected status: sororities and fraternities, segregated by sex; Newman Catholic Center and the Muslim Students' Association, where leaders must be (respectively) Catholic and Muslim; Iraqi

Student Organization, where a leader must be "Iraqi"; the list goes on. Organizations like College Democrats or PETA can limit their membership or leadership to people who commit to their core ideological or ethical beliefs. And Wayne State itself has many programs, scholarships, and sports teams whose participants or beneficiaries are also selected on the bases of protected categories in apparent violation of the Policy. But Wayne State targeted InterVarsity, a small Christian group that had no complaints about its leadership requirement and that wanted only the same right other organizations had: to be led by those who agree with its beliefs.

In targeting InterVarsity, Wayne State committed textbook First Amendment violations. Those included inhibiting a religious organization's selection of who will guide its faith, discriminating against InterVarsity's speech on the basis of viewpoint, violating InterVarsity's association, assembly, and free exercise rights, and impermissibly favoring certain religious denominations over others. Particularly given the legion of exceptions to its purported Policy, the University's drastic action cannot be the least restrictive way of furthering any compelling government interest.

Accordingly, InterVarsity respectfully requests that this Court grant it summary judgment and nominal damages, permanently enjoin Wayne State from violating InterVarsity's rights, and set a trial to determine damages.

## LEGAL STANDARD

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). "A party is entitled to a permanent

injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010) (cleaned up).

## ARGUMENT

"[T]he government cannot dictate to a religious organization who its spiritual leaders would be." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835-36 (6th Cir. 2015). But that is what Wayne State did in discriminatorily refusing to reregister InterVarsity because of how it selects its religious leaders. This action violated InterVarsity's religious autonomy under the First Amendment's combined Religion Clauses, as well as its distinct free speech, free association, and free exercise rights. It also violated the First Amendment's Establishment Clause, as well as InterVarsity's rights under the Michigan Constitution.

## I. Wayne State's interference in InterVarsity's leadership selection violated the Religion Clauses (Counts 1-2).

Religious groups have long enjoyed an "unquestioned" right to create and govern "voluntary religious associations to assist in the expression and dissemination of any religious doctrine." *Hutchison v. Thomas*, 789 F.2d 392, 394 (6th Cir. 1986). In 2012, affirming decades of consensus among the courts of appeals, the Supreme Court ruled unanimously that this right broadly protects the selection of religious leaders: "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran*

*Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012). And the Court recently reconfirmed that the Religion Clauses protect a religious organization's "autonomy with respect to internal management decisions that are essential to the institution's central mission"—and that "a component of this autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The Sixth Circuit has explained that this protection—often called the ministerial exception—is a "structural limitation imposed on the government" that "categorically prohibits federal and state governments from becoming involved in religious leadership" decisions. *InterVarsity*, 777 F.3d at 836.

The elements of this claim are straightforward: if (1) a "religious group," (2) is selecting "one of the group's ministers," (3) the government may not "interfer[e] with the freedom of [the] religious group[]" to make that selection. *Hosanna-Tabor*, 565 U.S. at 177, 184; *accord InterVarsity*, 777 F.3d at 833. Here, the Sixth Circuit has already held that InterVarsity/USA is a religious group, its officers are undoubtedly religious leaders, and Wayne State not only interfered with its leadership selection but categorically forbade it from requiring its leaders to embrace its faith. Wayne State thus violated the Religion Clauses.

## A. InterVarsity is a religious group.

The Sixth Circuit has already held that InterVarsity/USA "clearly" qualifies as a religious organization in light of "not only its Christian name, but [also] its mission of Christian ministry and teaching." *InterVarsity*, 777 F.3d at 834. That holding applies just as much to InterVarsity's Wayne State chapter, which has the same

mission and, for over seventy-five years, has led a distinctly religious ministry on campus via "weekly Bible Studies, meetings, and service opportunities for University students." Ex. C11 at WSU001717; *accord* Dkt. 6 at 1, PageID.94 (agreeing InterVarsity has a "Christian, religious mission"). And it is no surprise that a religious organization like InterVarsity would be in Wayne State's RSO program, given that other registered organizations include a church that holds weekly worship services and the Newman Catholic Center, which provides daily Mass. Ex. B16 at WSU003496; Ex. C4 at WSU006642 (row 59, col. R); Ex. C at 98:10-99:12 (religious RSOs may "celebrate sacraments, such as mass or baptisms or communion," hold "religious worship services," and observe holy days such as Yom Kippur and Eid al-Fitr).

### B. InterVarsity's officers hold religious leadership positions.

Under the Religion Clauses, a role is ministerial if it involves important religious functions. "What matters, at bottom," for determining ministerial status, "is what an employee *does*." *Our Lady*, 140 S. Ct. at 2064 (emphasis added). So, if a person "leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith," then the government is categorically barred from interfering in that person's selection or removal. *Id*. (cleaned up); *InterVarsity*, 777 F.3d at 835. And because InterVarsity's student leaders do *all* these things—lead, conduct worship, and serve as teachers of InterVarsity's faith—they serve as "ministers" within the meaning of the ministerial exception. *Ciurleo v. St. Regis Parish*, 214 F. Supp. 3d 647, 652 (E.D. Mich. 2016) ("[R]eligious function alone" can "provide[] the decisional pathway."). And that

5

conclusion only gets clearer by looking at additional considerations that courts can also weigh, such as a person's religious title and training. *See Our Lady*, 140 S. Ct. at 2062-63 (citing *Hosanna-Tabor*, 565 U.S. at 177-78, 191-92).

First and most importantly, InterVarsity's leaders are indisputably tasked with performing functions crucial to "conveying the [organization's] message and carrying out its mission." *Our Lady*, 140 S. Ct. at 2062 (internal quotation marks omitted). They are responsible for "organizing all meetings, activities and events" of the group, and are charged to "guide" their group in "follow[ing] Jesus as Savior and Lord" and in "growing in love for God, God's Word, God's people of every ethnicity and culture[,] and God's purposes in the world." Ex. 1 to the Garza Decl. at 1-2. They engage in a variety of religious functions, including leading prayer, religious services, and Bible study; engaging in outreach and prayer vigils; hosting conferences on religion; organizing service projects to serve the local community; and evaluating the religious qualifications and commitment of leadership applicants. Ex. C11 at WSU001717-18; Ex. 1 to the Garza Decl. at 2-3; Ex. G ¶¶ 9, 19-21; Ex. H ¶¶ 12-15; Ex. C at 227:9-22. Indeed, those religious functions are almost *all* they do—very little of their time is spent on non-religious administrative matters. Ex. G ¶ 19; Ex. H ¶ 15.

Moreover, every leader must agree to a set of "commitments" and "standards" for "Christian leaders"—including the same biblical belief-and-conduct standards that are prescribed by scripture for officers of a church. Ex. 1 of the Garza Decl. at 5-6 (InterVarsity Const. Art. XI, § II, cl. 1-2 (citing 1 *Peter* 5:1-7 and 1 *Timothy* 3:1-13)). All leaders must likewise affirm that they agree with both InterVarsity's

religious purpose and its religious doctrine. Ex. 1 of the Garza Decl. at 2. And all who apply to be "Christian Leaders" are informed that they are undertaking "serious spiritual responsibilities" and "will be expected to exemplify Christ-like character, conduct, and leadership" both "publicly and privately." Ex. 1 of the Garza Decl. at 4-6. Thus, InterVarsity's Christian Leader roles unquestionably perform the requisite "ministerial function[s]." *InterVarsity*, 777 F.3d at 835.

Second, InterVarsity's Christian Leaders have titles that confirm their spiritual role. As *Hosanna-Tabor* explained, the purpose of considering titles is to show that a position has a "role distinct from that of most of [the ministry's] members." 565 U.S. at 191. That distinct role is apparent here. The specific role of leader is identified in leadership applications as a "Christian Leader," Ex. 1 of the Garza Decl. at 5-6, and that wording clearly "conveys a religious—as opposed to secular— meaning." *InterVarsity*, 777 F.3d at 834-35. Moreover, only these leaders must affirm the group's purpose and beliefs and agree to personally follow those beliefs.

Third, InterVarsity trains its leaders for ministry. *Compare Hosanna-Tabor*, 565 U.S. at 181, 192, 193 and *Our Lady*, 140 S. Ct. at 2066 (considering training), *with* Ex. 1 of the Garza Decl. at 4-5 (InterVarsity Const. Art. XI, § 1 (stating leader applicants must have attended or be willing to attend "training . . . to develop [their] Christian life and leadership")), Ex. F at 109:7-14 (stating that student leaders are trained for ministry), Ex. G ¶¶ 14-17 (training included a six-week ministerial leadership program, multiple weekend and week-long training conferences, and weekly meetings with InterVarsity staff), and Ex. H ¶¶ 6-9 (training included six-week program and weekly meetings, plus a one-week leadership program and a

seven-week ministry program). InterVarsity's Christian Leaders are therefore ministers within the meaning of the ministerial exception whose selection is protected by the First Amendment.

### C. Wayne State impermissibly interfered with InterVarsity's religious leadership selection.

As a matter of constitutional structure, the Religion Clauses together wholly "'bar the government from interfering' with a religious organization's decisions as to who will serve as ministers." *InterVarsity*, 777 F.3d at 836 (quoting *Hosanna-Tabor*, 565 U.S. at 181). The "very existence" of religious organizations "is dedicated to the collective expression . . . of shared religious ideals" and "the content and credibility of a religion's message depend vitally on the character and conduct of its teachers." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., concurring). Without a religious organization having "the authority to select, supervise, and if necessary, remove a [leader] without interference by secular authorities," "a wayward [leader's] preaching, teaching, and counseling could contradict the" tenets of the organization and lead its members "away from the faith." *Our Lady*, 140 S. Ct. at 2060. Thus, there "can be no clearer example of an intrusion into the internal structure or affairs" of a religious student group than forcing it to accept leaders who do not share its faith, since that "would cause the group as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006) (protecting religious student group from punishment by public university based on its leadership policy). Indeed, Wayne State's own witnesses agree that "requiring

InterVarsity to have a leader who doesn't share its faith could change the nature of the organization." Ex. E at 79:18-80:3, 86:6-10, 96:17-22.

By denying registration because of InterVarsity's leadership policies, Wayne State violated the Religion Clauses' rule that the government is not allowed "to dictate or even to influence" who a religious organization's spiritual leaders will be. *Our Lady*, 140 S. Ct. at 2060. And because this rule is "a structural [limitation] that categorically prohibits federal and state governments from becoming involved in religious leadership disputes," *InterVarsity*, 777 F.3d at 836, there is no strict scrutiny defense, and this Court can grant summary judgment in InterVarsity's favor on its Religion Clauses claims without reaching the other claims. *See also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (explaining that the rule "is rooted in constitutional limits on judicial authority").

## II. Wayne State violated the First Amendment by discriminating against InterVarsity's religious viewpoint.

The First Amendment has distinct protections for speech, association, assembly, and the free exercise of religion that cannot be breached unless the State proves that the breach is the least restrictive means of accomplishing a compelling governmental interest. Wayne State's action here infringed each of these protections, and it cannot satisfy strict scrutiny.

### A. Wayne State infringed InterVarsity's free speech rights (Counts 7–8).

State universities are not obligated to grant official recognition to student organizations, but once they do, they have created a limited public forum that is governed by the First Amendment and cannot discriminate based on viewpoint.

*Widmar v. Vincent*, 454 U.S. 263, 267 (1981); *see Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (en banc). While "some content- and speaker-based restrictions may be allowed" in the forum, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017), universities face at least two restrictions: (1) they "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,'" and (2) they may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ; *Healy v. James*, 408 U.S. 169, 181 (1972) (universities cannot deny "recognition . . . to college organizations" on the basis of their views). Wayne State fails both tests, including under *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010).

### 1. Wayne State's refusal to reregister InterVarsity was unreasonable in light of the forum's purpose.

A content-based limitation "may" be reasonable if it "preserves the purposes of th[e] limited forum," but only if it "respect[s] the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829-30. For instance, a forum dedicated to the exchange of *students'* ideas about *art* can reasonably exclude *non*-student speech about *science*, but it could not make "other content-based judgments" that disrespect the forum's own boundaries. *Martinez*, 561 U.S. at 703 (Kennedy, J., concurring).

The express purpose of Wayne State's RSO program is "[t]o support student intellectual growth and social maturity through promoting ethical and moral development, appreciating diversity, encouraging civic engagement, providing leadership development, and supporting the establishment of meaningful interpersonal relationships." Ex. C1 at WSU000600. Wayne State has also said that

the student organization program "prepare[s] a diverse student body to thrive" and "be leaders in a diverse world." Ex. B10 at 6. Wayne State recognizes that "when a student is connected to something or some things or someone on campus, the data will show you that those students retain at a higher rate and graduate at a higher rate." Ex. D at 121:1-5. Thus, Wayne State encourages students to form and join student organizations to "[p]ursue [their] interests, participate in diverse programming and make the most of [their] [Wayne State] experience." Ex. B15 at WSU000646; *see* Ex. C7 at WSU000316 (encouraging students to join Greek student organizations to "meet new people that may have similar values, interests, or academic programs").

Having created such a limited public forum with the express purpose of allowing like-minded students to organize around shared interests, the decision to deny InterVarsity's registration because it requires its leaders to embrace its beliefs was not reasonable. Students cannot associate around hidden beliefs, and an organization—especially a religious one—cannot survive without leaders who agree with and promote its beliefs. Refusing to let groups select mission-aligned leaders would destroy Wayne State's purpose of allowing students to form *interest*-based organizations. A feminist organization could not exclude leaders who think feminism is an assault on men's rights. A transgender support group could not exclude leaders who advocate against rights for transgender individuals. And minority rights groups could not exclude leaders who ridicule the idea of white privilege or oppose affirmative action.

Wayne State recognizes this elsewhere. For example, it permits other student organizations to require that members and leaders support the organizations' goals. *E.g.*, Ex. B16 at WSU004474 (Wayne African Student Society, members must "understand and support[]" its "societal goals and purposes"); *id.* at WSU004005, WSU004001 (Secular Student Alliance, leaders "have shown commitment to the group," which seeks "[t]o promote secular values"); *id.* at WSU003930 (Macedonian-American Student Association, members must "agree with the goals of the group"); *id.* at WSU003280 (National Black Operations Business Association, members must be "passionate about social issues and business topics which effect the black community as a whole"). Wayne State has also permitted Greek groups to choose members and leaders who will adhere to a code of conduct, including certain ethical values—and the head of Wayne State's Greek program testified that such requirements *promote* the RSO goals of meaningful personal relationships and moral development. Ex. E at 37:13-18, 40:21-41:1, 42:6-43:1, 44:13-22.

Denying InterVarsity this same ability to select leaders who share its beliefs was thus a direct violation of the RSO policy's core purpose of encouraging the formation of student organizations to promote a diversity of interests and a robust social environment. Moreover, to the extent that the student organization program seeks to "prepare students to" "thrive" and "be leaders in a diverse world," Ex. B10 at 6, in that world, religious organizations have the constitutional right to choose leaders who agree with the organizations' beliefs. *See* Section I, *supra*. Denying InterVarsity's registration was not reasonably related to the forum's purpose, and so strict scrutiny applies.

### 2. Wayne State discriminated on the basis of viewpoint.

Wayne State's refusal to reregister InterVarsity because of its religious standards for leaders also constituted viewpoint discrimination. Universities engage in forbidden viewpoint discrimination when their actions stem from the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829; *see Kincaid*, 236 F.3d at 357. Courts "use the term 'viewpoint' discrimination in a broad sense," and have said "time and again" that this factor particularly forbids any offense-based restrictions, since "[g]iving offense is a viewpoint." *Matal*, 137 S. Ct. at 1763. Where a particular viewpoint fits "within the forum's limitations," restrictions on it are "presumed impermissible." *Rosenberger*, 515 U.S. at 830. And impermissible restrictions need not be flat bans or censorship. Rather, ideological discrimination or favoritism is enough: "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Matal*, 137 S. Ct. at 1757 (quoting *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)).

As relevant here, selecting leaders is an expressive act. "When student groups in a limited public forum assert free speech and expressive association claims stemming from restrictions on their leadership criteria, 'who speaks on the group's behalf colors what concept is conveyed.'" *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 978-79 (S.D. Iowa 2019) ("*IVCF-Iowa*") (quoting *Martinez*, 561 U.S. at 680 (cleaned up)). The Supreme Court has long protected the selection of an expressive organization's leaders, since the "choice of a candidate is the most effective way in which that [organization] can communicate."

13

*Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000). Compelling faith groups to select unfaithful leaders is the equivalent of "coerc[ion] into betraying their convictions" by making them "endorse ideas they find objectionable," which is "always demeaning." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018).

Here, Wayne State admitted that it would have accepted InterVarsity's constitution and registered the organization "if it eliminated the faith-based criteria for leadership." Ex. B9 at 21. Villarosa said the same thing. Ex. C at 190:19-191:4. Wayne State discriminated on viewpoint by allowing non-religious groups to choose leaders based on agreement with the groups' missions but denying InterVarsity—a religious group—that same ability. As another court explained in a substantially similar case, "university nondiscrimination policies are not viewpoint neutral if they are selectively applied to restrict the leadership and/or membership requirements of some student groups but not others." *IVCF-Iowa*, 408 F. Supp. 3d at 979; *cf. Widmar*, 454 U.S. at 264-65 (a university that "makes its facilities generally available" to student groups cannot exclude a "group desiring to use the facilities for religious worship and religious discussion").

Perhaps most blatant, Wayne State conceded that under its Policy, groups like College Democrats or PETA could limit their membership or leadership to people who commit to their core ideological or ethical beliefs, but InterVarsity cannot ask its leaders to hold similar beliefs rooted in religious conviction. *See* Ex. C at 99:22-100:8. Thus, Wayne State registered Young Americans for Freedom, which requires members to agree with its political "principles." Ex. B2 at WSU006644 (row 14, col.

T). It also registered International Youth and Students for Social Equality, whose goal is "to fight for a Marxist perspective at Wayne State University," and which requires members and leaders to be "in full agreement with the IYSSE statement of principles." Ex. B16 at WSU003187; *see* Ex. B7 at WSU006650 (row 39, cols. T, V); Ex. C4 at WSU006642 (row 39, cols. T, V). But Wayne State refused to register InterVarsity for requiring that its leaders adhere to its *religious* principles. Thus, even if the content of certain required principles is essentially identical—ethical treatment of animals, care for the poor, concern for justice—InterVarsity is banned for having a religious viewpoint on those common principles. That is "blatant" viewpoint discrimination. *Rosenberger*, 515 U.S. at 829. For decades, it has been "quite clear" that government may not consider reliance on religious beliefs to "taint[]" a viewpoint "in a way that other foundations for thought or viewpoints do not." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 108-11 (2001).

Wayne State's application of its Policy in other contexts further confirms its viewpoint discrimination. Even though Wayne State claimed that InterVarsity's "officer requirements" violate its non-discrimination Policy, Ex. C9 at WSU002847, Wayne State permits other groups to use "discriminatory" criteria to select both leaders *and* members. For instance, Wayne State gives sororities and fraternities an exemption from the prohibition against sex discrimination—and in fact gives them very broad discretion in their membership and leadership decisions. Ex. C at 136:7-8; *see id.* at 144:16-145:16, 146:13-18; Ex. D at 140:4-10; Ex. at E at 35:6-8, 71:14-21, 79:2-4 ("Greek groups at Wayne State control their own membership" and leadership). Wayne State provides a similar exemption for sports clubs. Ex. C at

156:19-157:3; Ex. D at 150:21-151:2. By exempting those groups from the prohibition against sex discrimination in selecting leaders, but not exempting religious organizations from the prohibition against religious discrimination, Wayne State sends a message that leadership selection on the basis of sex is permissible, but not leadership selection on the basis of religion. This is problematic considering that the First Amendment gives unique protection to religious groups in the selection of their leaders. It is doubly so given that Wayne State's categorical preference for Greek groups and sports clubs is based on an obvious legal error: interpreting Title IX to *mandate* exemptions from *the Policy*, when in fact Title IX merely *permits* exemptions *from Title IX*. Ex. C at 143:6-144:3, 150:22-151:14, 157:4-7, 230:2-15.

Likewise, the uneven enforcement of Wayne State's Policy to other student organizations and the University itself confirms the viewpoint discrimination. *See Walker*, 453 F.3d at 866 (viewpoint discrimination indicated by university "appl[ying] its antidiscrimination policy to [the plaintiff] alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy"). As demonstrated, Wayne State has registered many student organizations besides sports clubs and Greek groups that discriminate on grounds supposedly barred by the Policy. *E.g.*, Ex. C4 at WSU006642 (row 40, col. V) (Iraqi Student Organization, leaders must be "Iraqi"); Ex. B16 at WSU003952 (Anakh Sherniyan Di, "all girls"); Ex. B16 at WSU004104 (Queer WSU Students of Color, leadership preference to queer persons of color). Similarly, Wayne State *itself* continues to administer a wide range of programs, scholarships, and awards that discriminate on grounds forbidden by the Policy. *Supra* at SOMF ¶¶ 68-72.

16

As the Sixth Circuit has explained, "Tolerance is a two-way street. Otherwise, the rule mandates orthodoxy, not anti-discrimination." *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012). Permitting dozens of RSOs and University programs to select members, leaders, participants, and beneficiaries based upon characteristics listed in the Policy, but penalizing InterVarsity for doing the same, is textbook viewpoint discrimination. *Accord IVCF-Iowa*, 408 F. Supp. 3d at 980; *BLinC v. Univ. of Iowa*, 360 F. Supp. 3d 885, 899 (S.D. Iowa 2019) (in a similar case, finding that no triable issue of fact existed on viewpoint discrimination). Therefore, strict scrutiny applies.

### 3. *Martinez* condemns Wayne State's discriminatory actions.

As this Court has already recognized, *Martinez* does not help Wayne State because there, the Supreme Court "expressly limited its holding to an all-comers policy"—and Wayne State admits that its Policy "is not an 'all-comers' policy." Dkt. 26 at 15–16, PageID.508-09. Wayne State's interpretation and enforcement of its Policy is a far cry from *Martinez*, where even "the Hastings Democratic Caucus [could not] bar students holding Republican political beliefs from becoming members or seeking leadership positions." *Martinez*, 561 U.S. at 675; *compare* Ex. C at 99:22-100:3, 157:16-158:1 (explaining the College Democrats *could* limit membership and leadership based on political affiliation).

Further, *Martinez* recognized that limitations on leadership raise unique constitutional problems. The majority found it unlikely that students would "seek leadership positions in . . . groups pursuing missions wholly at odds with their personal beliefs," and stated that if such a student did so, the groups could decline to "elect her as an officer." 561 U.S. at 692-93. Justice Kennedy's concurrence said

that a religious student group would have a "substantial case" if even a true all-comers policy was used to "challenge [group] leadership." *Id.* at 706. And, as discussed above, the Court later unanimously agreed on this point, ruling that government may not restrict religious groups' selection of religious leaders. *Hosanna-Tabor*, 565 U.S. at 188-89.

Finally, *Martinez* affirms the long "series of decisions" which "emphasized" that the First Amendment "precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." 561 U.S. at 667-68. That is precisely the line that Wayne State crossed here. *Martinez* thus requires strict scrutiny.

## B. Wayne State infringed InterVarsity's association and assembly rights (Counts 6, 9).

*Association.* The Supreme Court has clearly established that "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed" by the government. *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 309 (2012). "In analyzing an expressive association claim, courts use a three-step process." *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). "The first determination is whether a group is entitled to protection." *Id.* For this element, "a group need not associate for the purpose of disseminating a certain message to be protected; it is enough that a group engages in expressive activity that could be impaired." *Id.* (cleaned up). Here, InterVarsity qualifies as an expressive association because it undisputedly seeks to promote a core set of religious beliefs and doctrines. InterVarsity's student leaders are charged with not only leading the organization, but

also teaching Bible studies and leading prayers and other religious services. Such groups are quintessential examples of expressive associations, since their "very existence is dedicated to the collective expression . . . of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring).

Second, courts determine whether the government restriction would "significantly affect the [association's] ability to advocate [its] viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 650 (2000). Here again, courts broadly construe the right and "must also give deference to an association's view of what would impair its expression." *Id.* at 653. And here again, the answer is clear: InterVarsity's student leaders are charged with not only leading the organization, but also teaching Bible studies and leading prayers and other religious services. Being forced to accept leaders who reject the group's religious beliefs would effectively force InterVarsity "to propound a point of view contrary to its beliefs," *id.* at 654, which is an impermissible restriction on its expressive association. It would, as Wayne State's Coordinator of Student Organization Programs testified, "change the nature of the organization." Ex. E at 96:17-22; *see Dale*, 530 U.S. at 654 (holding that overriding the Boy Scouts' right to exclude leaders who reject its standards would "surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs"). Indeed, that is precisely what the Seventh Circuit concluded in *Walker*, where it held that a university violated free association by derecognizing a religious student group for requiring leaders and members to embrace its faith. *Walker*, 453 F.3d at 861.

"Lastly, the government's interest in any restriction must be weighed against plaintiff's right of expressive association." *Miller*, 622 F.3d at 538. Any restrictions "are permitted only if they serve compelling state interests that are unrelated to the suppression of ideas—interests that cannot be advanced through significantly less restrictive means." *Martinez*, 561 U.S. at 680 (cleaned up). As shown below, Wayne State cannot meet this standard.

***Assembly.*** Wayne State's action separately violated InterVarsity's First Amendment right "peaceably to assemble" to engage in otherwise lawful religious worship and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 530–40 (1945); *see generally* John D. Inazu, *Liberty's Refuge* (2012). The right of organizations "to select their members and leaders" "is an essential aspect of assembly." Ashutosh Bhagwat, *Liberty's Refuge, or the Refuge of Scoundrels?*, 89 Wash. U. L. Rev. 1381, 1384 (2012). Because Wayne State has placed a discriminatory limitation on InterVarsity's right to assemble, it must face strict scrutiny. *County of Butler v. Wolf*, 2020 WL 5510690, at *13 (W.D. Pa. 2020).

## C. Wayne State infringed InterVarsity's free exercise rights (Counts 3–4).

Wayne State separately violated the Free Exercise Clause by singling out InterVarsity's religious practices for censure. The Free Exercise Clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws" that disfavor religion. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542-43 (1993)). Thus, "laws burdening religious practice must be of general applicability" and neutral. *Lukumi*, 508 U.S. at 542.

20

For example, in *Ward v. Polite*, a student sued after being expelled from her counseling program because, during a practicum, she sought to refer to another provider a student who sought counseling about a same-sex relationship. Addressing her free exercise claim and reversing the district court's grant of summary judgment for the university defendants, the Sixth Circuit emphasized that if a government policy "appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions," it must face strict scrutiny. 667 F.3d at 738. The Court noted that the university's application of its anti-discrimination policy "seems to permit referrals for secular—indeed mundane—reasons, but not for faith-based reasons" and was therefore not "even-handed," much less "faith-neutral." *Id.* at 739. Such an "ad hoc application" would mean that the policy was in reality "a system of individualized exemptions, the antithesis of a neutral and generally applicable policy." *Id.*

***General Applicability***. A law is not generally applicable if it burdens religiously motivated conduct while exempting, or giving the government discretion to exempt, similar non-religious conduct. *See Lukumi*, 508 U.S. at 543; *accord Ward*, 667 F.3d at 738-40. "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020). Here, Wayne State's exception-riddled Policy is not generally applicable for at least four reasons.

*First*, it was not and is not enforced equally. *Lukumi*, 508 U.S. at 545-46 (a regulation "'that society is prepared to impose upon [religious groups] but not upon itself'" is the "precise evil . . . the requirement of general applicability is designed to

prevent"); *Tenafly Eruv Ass'n v. Borough of Tenalfy*, 309 F.3d 144, 167-68 (3d Cir. 2002) (rejecting a "selective, discretionary application of [the law] against" religious conduct). As discussed, Wayne State does not enforce the Policy equally against other RSOs or against itself.

*Second*, the Policy contains an express but undefined exemption that gives Wayne State officials broad discretion to grant "individualized exemptions." *Ward*, 667 F.3d at 740. This exemption allows discrimination on protected characteristics if it is "designed to achieve full equity for minorities." Ex C5 at WSU001371. But the Policy has no definition of who qualifies as "minorities," nor has Wayne State provided training or guidance on that score. Ex. C at 121:20-123:14. Instead, the Policy leaves Wayne State officials discretion to decide what counts. *Id.* at 158:12-21. Thus, for instance, discrimination on the basis of sex, race, and veteran status regarding access to scholarships, use of school facilities, or membership in an RSO have all been justified based on the "minorities" exception. *Id.* at 111:5-121:11.

*Third,* Wayne State has categorically exempted *dozens* of RSOs—Greek groups and sports clubs—from the reach of its Policy. While "[a]ll laws are selective to some extent," "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Lukumi*, 508 U.S. at 542. Where a categorical exemption threatens the government's interests "in a similar or greater degree than [the prohibited religious exercise] does," it must face strict scrutiny. *Id.* at 543; *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (scrutiny triggered by "categorical exemption for individuals with a secular objection [to the policy] but not for individuals with a religious objection").

As the Sixth Circuit has explained, "a proliferation of unexplained exceptions turns a generally applicable law into a discriminatory one." *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020). That is this case.

The most obvious categorical exemption to the Policy is the unwritten exemption Wayne State offers to its many Greek groups. Ex. B14 at WSU000364. By contrast to InterVarsity—which only limits a handful of leadership positions but otherwise opens membership, participation, and benefits to all—Greek groups may exclude students based on sex from *hundreds* of leadership and membership positions, as well as access to group participation and benefits. Ex. E at 35:6-8, 71:14-21, 77:4-6, 79:2-4; Ex. C at 136:7-17; Ex. D at 138:13-140:10. As *IVCF-Iowa* explained, this broad categorical exemption for Greeks can "cause much more harm" to the government's purported interests "than granting InterVarsity the exception it seeks." 408 F. Supp. 3d at 982-83.

*Fourth*, Wayne State has chosen to leave unprohibited a variety of secular categories that equally threaten the purposes of the Policy. *Lukumi*, 508 U.S. at 543. Wayne State bans InterVarsity's *religious* leadership selection, but allows other groups to restrict leadership based on all sorts of ideological and political beliefs. *See supra* at SOMF ¶¶ 65-67. This acts as a massive categorical exemption for *non*-religious groups. And as *IVCF-Iowa* explained, "[p]olitical student groups discriminating on the basis of creed undermine the University's interests in equal access and creating an environment for diverse viewpoints as much if not more than religious groups limiting leadership on the basis of religious belief." 408 F. Supp. 3d at 982.

23

In all four forms of discrimination above, the government "devalues religious reasons for [acting] by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537; *IVCF-Iowa*, 408 F. Supp. 3d at 983; *BLinC*, 360 F. Supp. 3d at 902. That kind of governmental value judgment against religious motivations "must run the gauntlet of strict scrutiny." *Ward*, 667 F.3d at 740; *accord Trinity Lutheran*, 137 S. Ct. at 2019.

**Neutrality.** The "minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. But mere "[f]acial neutrality" is not enough. *Id.* at 534. Rather, the Free Exercise Clause forbids "covert suppression" of religion and "subtle departures from neutrality"; government hostility that is "masked" as well as "overt." *Id*. "[E]ven slight suspicion" that state action against religious conduct "stem[s] from animosity to religion or distrust of its practices" is enough to require government officials to reconsider. *Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 547).

Here, as is often the case, the glaring general-applicability violations also show a lack of neutrality: "A double standard is not a neutral standard." *Ward*, 667 F.3d at 740. The "difference in treatment" between how Wayne State has treated InterVarsity and how it treats other organizations with selective membership or leadership policies provides "[a]nother indication of hostility" and compels strict scrutiny. *Masterpiece*, 138 S. Ct. at 1730; *see also id.* at 1732 ("disparate consideration" of a religious objector compared to secular entities suggests a violation of "the requisite religious neutrality that must be strictly observed").

And the neutrality violation is doubly clear because Wayne State admits its Policy forbids InterVarsity's religious leadership requirement *solely because of its religious content*. As noted above, if InterVarsity's leadership limitation had been grounded in politics or ideology, it would have been fine. Ex. C at 99:22-100:8; 157:16-158:1. But because InterVarsity required leaders to affirm its religious beliefs, it was banned and tarred by the Wayne State as "mak[ing] second-class citizens of students who refuse to accept [its] religious pledge." Dkt. 6 at 17, PageID.110. Thus, again, Wayne State's actions must undergo strict scrutiny.

### D. Under the Establishment Clause, Wayne State's religious preference triggers strict scrutiny (Count 5).

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Here, Wayne State seeks to apply its Policy to penalize InterVarsity because of its religious leadership requirements, even though Wayne State has *not* penalized other religious groups on campus for their similar requirements. Among other examples, *supra* at SOMF ¶ 57, the Newman Catholic Center was registered even though it required its leaders to "be Catholic" and "comfortable with the organization's mission and teachings." Ex. C4 at WSU006642 (row 59, col. V). And the Muslim Students' Association was registered even though it requires leaders to be "Muslim." Ex. C4 at WSU006650 (row 57, col. V). Because Wayne State has "discriminat[ed] among religions," its action is "subject to strict scrutiny." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987).

**E. Wayne State's discrimination against InterVarsity fails strict scrutiny.**

"No state action that limits [First Amendment rights] will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc). This is "the most demanding test known to constitutional law," and the evidentiary "burden for justifying" the Policy's restrictions on InterVarsity "falls entirely upon" Wayne State. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 (6th Cir. 2015).

**1. Wayne State has no compelling interest in penalizing InterVarsity.**

Wayne State has a heavy burden to show that its interests are compelling: "only the gravest abuses, endangering paramount interest, give occasion for permissible limitation" on a "First Amendment right." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). And here, the compelling interest analysis is open and shut: because the Policy "leaves appreciable damage to [its] supposedly vital interest[s] unprohibited," Wayne State's ban on religious leadership selection "cannot be regarded as protecting an interest of the highest order." *Lukumi*, 508 U.S. at 547; *accord Ward*, 667 F.3d at 740 ("multiple" exceptions "severely undermine" claimed interest). Thus, setting aside the apparently recent provenance of the Policy's application to student organizations, Wayne State's arbitrary application of the Policy arbitrarily dooms its defense.

Of course, InterVarsity has no objection to the accommodations from the Policy that Wayne State explicitly or implicitly grants to its own programs, Greek groups, sports clubs, and various other RSOs. But Wayne State cannot claim a compelling

interest in enforcing a rule against InterVarsity that it does not follow itself, allows other groups to ignore, and regularly departs from at its discretion. *Lukumi*, 508 U.S. at 547; *IVCF-Iowa*, 408 F. Supp. 3d at 984 ("[B]y choosing to accept some such harms while restricting InterVarsity's leadership requirements … the University's interests that support the restriction are not compelling."). No more is necessary to find that the Policy flunks strict scrutiny. But there is plenty more.

For instance, Wayne State fatally undermined its ability to prove that excluding InterVarsity serves a compelling interest by reversing its position in response to this lawsuit. *Supra* at SOMF ¶¶ 88-90. If its interests were "'of the highest order,'" *Lukumi*, 508 U.S. at 547, Wayne State would not have changed course within forty-eight hours of being sued.

Further, Wayne State entirely failed to show that there was any InterVarsity-specific "actual problem" in need of solving in the first place. *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). Wayne State cannot merely make "generalized assertion[s]," *Ward*, 667 F.3d at 740, but must prove that it has compelling interest in denying "specific exemptions to particular religious claimants"—here, denying accommodation to InterVarsity's leadership standards. *Gonzales v. O Centro*, 546 U.S. 418, 431-32 (2006) (citing *Sherbert*, 374 U.S. at 407). And it must provide a "'strong basis in evidence'" on this score. *Russell*, 784 F.3d at 1052. But the record shows the exact opposite: Wayne State admitted that, in the seventy-five years before deregistration and in the nineteen months since re-registration, there is *no* evidence *anyone* complained about InterVarsity's leadership standards. Ex. C at 209:10-16. Nor is there *any* record of *any* attempt by Wayne State

to gather, discuss, or otherwise identify any specific evidence of harms that were caused by InterVarsity's religious leadership standards. *Id.* at 211:8-16; Ex. D at 78:19-79:5; *cf. IVCF-Iowa*, 408 F. Supp. 3d at 983 ("The evidence shows the University has not identified any actual harm to its interests caused by InterVarsity's religious leadership requirements.").

Wayne State also failed to show that denying Greek groups (or other groups) an exemption for sex-based (or any other) discrimination would *harm* its interests. *See* Ex. C at 141:2-142:9. That is, Wayne State's balancing of comparative interests among who it exempts and who it restricts is entirely unmoored from any sort of evidence-based analysis. *See, e.g.*, *id*. at 142:5-22. Moreover, Wayne State has not set up any way to monitor whether prohibiting InterVarsity's leadership selection and allowing Greek groups' membership exclusions either help or harm its interests. *See id.* at 141:2-42:22. Wayne State accordingly appears entirely uncurious about the real-world effects of its Policy. *See, e.g.*, *id.* at 142:5-22. And that is fatal for its strict scrutiny showing. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 821 (2000) (governmental failure to conduct "some sort of field survey" made it "impossible to know" if the regulation served its alleged interest, meaning it flunked strict scrutiny). "Precision of regulation must be the touchstone in First Amendment context," *Knox*, 567 U.S. at 314 n.3, and precision is impossible where the government is flying blind.

Indeed, as noted above, accommodating InterVarsity *serves* Wayne State's claimed interests. Wayne State says its Policy is meant to "advance knowledge" by helping students "learn from each other," "prepare a diverse student body" to "be

leaders in a diverse world," and "positively impact local and global communities." Ex. B10 at 6. InterVarsity accomplishes all those goals by allowing all students to participate in and learn from its activities, thereby contributing to the diversity of groups on campus and the local community. By contrast, denying registration to InterVarsity flattens campus diversity, reduces learning opportunities, and essentially "mandates orthodoxy." *Ward*, 667 F.3d at 735.

Finally, Wayne State does not treat its Policy as promoting paramount interests that can overbalance First Amendment rights. For instance, Wayne State was unable to articulate any difference in its interests in eradicating *racial* discrimination and those it has in eradicating *height* and *weight* discrimination. Ex. C at 162:2-165:9, 166:20-167:6. Nor did it give any reason to target height and weight discrimination over allowing discrimination based on grounds such as politics, ideology, physical appearance, GPA, and even *ethnicity.* Ex. C at 99:22-100:3, 157:16-158:1, 165:19-22; Ex. B12 at 4 n.2. And the University's own Coordinator of Student Organization Programs and Fraternity and Sorority Life testified that he received no training regarding the Policy, was not told what was in the Policy, and had never "actually read this policy." Ex. E at 53:10-12, 54:2-3, 57:6-10.

### 2.  Wayne State has not employed the least restrictive means available.

Wayne State also fails to meet the "exceptionally demanding" least-restrictive-means test. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Under that test, if a less restrictive alternative would serve the government's purpose, the government "*must* use that alternative." *Playboy Ent. Grp.*, 529 U.S. at 813 (emphasis added).

For starters, Wayne State has long managed to accommodate its own programs, scholarships, sports programs, and so forth, along with the missions of other student groups, without sacrificing the interests promoted by the Policy. Wayne State has also managed to accommodate its own mission and InterVarsity for seventy-five years without complaint, and does so again today. *See* Ex. D at 78:15-79:5. That is sufficient evidence that both diversity and freedom of speech on religious issues can coexist, and that Wayne State's Policy "hardly counts as no-more-than-necessary lawmaking." *Neace*, 958 F.3d at 415; *Lukumi*, 508 U.S. at 546 (underinclusiveness suggests the government's "interests could be achieved by narrower [policies] that burdened religion to a far lesser degree").

Moreover, Wayne State's failure to study the issue closely submarines its least-restrictive-means defense just as much as its compelling-interest one. Wayne State did not identify any effort to study or even consider reasonable alternatives or accommodations for InterVarsity. Ex. C at 231:3-232:4. "It is difficult to understand how [Wayne State] could have narrowly tailored its response to InterVarsity's leadership requirements without knowing or understanding the harms they caused." *IVCF-Iowa*, 408 F. Supp. 3d at 984.

Further, the government generally "'cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'" *Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 751-52 (8th Cir. 2014). But Wayne State admitted that it made no attempt to study or explain why it could not adopt the policies of public universities that accepted InterVarsity's leadership

requirements, such as the University of Michigan, Michigan State, or Central Michigan (where Villarosa taught). Ex. C at 212:6-214:2, 256:1-6; Ex. D at 186:12-22. Such non-existent "efforts to explain" why "the plans adopted by those other institutions would not work" are insufficient, *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 534 (11th Cir. 2013), and further show Wayne State cannot prove it "customize[d its] orders to the least restrictive way of dealing with the problem at hand." *Neace*, 958 F.3d at 416; *accord NIFLA v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (government flunked the narrow-tailoring test where it had "identified no evidence" to "prove" tailoring); *accord IVCF-Iowa*, 408 F. Supp. 3d at 983.

* * * *

Wayne State's discrimination burdens InterVarsity's religious beliefs, speech, and association without a sufficient justification and thus violates the First Amendment. This Court should accordingly grant summary judgment to InterVarsity and set a trial to determine damages. It should also award nominal damages as a matter of law. *IVCF-Iowa*, 408 F. Supp. 3d at 988 (citing *Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) ("[N]ominal damages must be awarded when a plaintiff establishes a violation of the right to free speech.")); *accord Meade v. Plummer*, 344 F. Supp. 2d 569, 574 (E.D. Mich. 2004).

## III. Wayne State violated the Michigan Constitution (Count 15).

"The Michigan Constitution also contains its own guarantee of religious freedom, which is at least as protective of religious liberty as the United States Constitution." *Winkler by Winkler v. Marist Fathers of Detroit, Inc.*, 901 N.W.2d 566, 573 n.4 (Mich. 2017) (internal quotation marks and citation omitted). Article I, § 4 of the

Michigan Constitution provides that "[e]very person shall be at liberty to worship God according to the dictates of his own conscience" and that "[t]he civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief." This protection is "analyze[d] . . . under the compelling state interest test developed by the United States Supreme Court in *Wisconsin v. Yoder* and *Sherbert v. Verner*." *McCready v. Hoffius*, 586 N.W.2d 723, 729 (Mich. 1998), *vacated in part on other grounds*, 593 N.W.2d 545 (Mich. 1999). Under that test, it does not matter whether the Policy was generally applicable or neutral. Instead, all that matters is whether Wayne State can show that "a compelling state interest justifies" the burden it imposed on InterVarsity's sincere religious beliefs, and that there is no "less obtrusive form of regulation available." *McCready*, 586 N.W.2d at 729. Wayne State cannot make that showing, meaning the individual-capacity Defendants are liable.

## IV.   This Court should grant permanent injunctive relief.

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Wedgewood*, 610 F.3d at 349 (internal quotation marks omitted). As established above, InterVarsity has proven actual success on the merits of its legal claims, which is the key factor in First Amendment cases. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012). Yet Wayne State continues to defend its actions and assert that InterVarsity is in violation of University Policy. *See* Ex. C at 255:5-10. Therefore, an injunction is required to protect InterVarsity from irreparable harm.

32

All the relevant factors point the same way: "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" vindicating those freedoms is "always in the public interest," and the balance of harms tips in favor of the First Amendment. *Bays*, 668 F.3d at 825. Indeed, if the challenged government action is unconstitutional, not even a "substantial harm to others can be said to inhere its enjoinment." *Id.* Not that there is any such harm here: Wayne State failed to identify anyone who wanted to lead prayers on behalf of InterVarsity to a God they do not believe in, nor any reason to think such people now—after 75 years—exist. Ex. C at 219:20-220:16. By contrast, vindicating InterVarsity's First Amendment rights would further the public's interest in the "open marketplace" of ideas, where "differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox*, 567 U.S. at 309 (internal quotation marks omitted). And "nowhere" is this interest "more vital than in the community of American schools." *Walker*, 453 F.3d at 864 (quoting *Healy*, 408 U.S. at 180).

## CONCLUSION

For all the foregoing reasons, InterVarsity respectfully urges the Court to grant this motion for summary judgment, award nominal damages, issue a permanent injunction, and set a trial to determine damages. InterVarsity respectfully requests oral argument on this motion.

Respectfully submitted this 22nd day of October 2020.

Respectfully submitted,

Paul C. Schultz
Mitzel Law Group PLC
1590 Eisenhower Pl.
Ann Arbor, MI 48108-3284
(734) 668-4100 phone
*pschultz@mitzellaw.com*

*/s Daniel H. Blomberg*
Daniel H. Blomberg
Eric S. Baxter
Christopher Mills
Lori WindhamThe Becket Fund for
Religious Liberty
1200 New Hampshire Ave. NW, Suite
700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*dblomberg@becketlaw.org*

**Counsel for Plaintiffs**

34

## CERTIFICATE OF SERVICE

I, Daniel H. Blomberg, certify that the forgoing document was filed and served via the Court's electronic case filing and noticing system (ECF) this 22nd day of October, 2020, which will automatically send notification of such filing to all attorneys and parties of record registered electronically.


*/s/ Daniel H. Blomberg*
Daniel H. Blomberg