## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

INTERVARSITY CHRISTIAN FELLOWSHIP/USA
and INTERVARSITY CHRISTIAN FELLOWSHIP
WAYNE STATE CHAPTER,

      Plaintiffs,

v.                                      Case No. 19-10375

BOARD OF GOVERNORS OF WAYNE STATE
UNIVERSITY, *et al.*,

      Defendants.
_____/

### ORDER AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND ORDERING ADDITIONAL BRIEFING

Plaintiffs InterVarsity Christian Fellowship/USA and InterVarsity Christian Fellowship, Wayne State Chapter, ("Intervarsity") has for 75 years operated a Christian student organization on the campus of Wayne State University, but in 2017 was denied continued official recognition or registration as a legitimate student group. Why? Because Intervarsity's leadership standards ran afoul of the college's "non-discrimination policy" in requiring that its faith leaders profess to be faithful.

Plaintiffs bring this action against Defendants Board of Governors of Wayne State University, Roy Wilson, Sandra Hughes O'Brien, Michael Busuito, Mark Gaffney, Marilyn Kelly, Dana Thompson, Bryan C. Barnhill II, Anil Kumar, Shirley Stancato, David Strauss, and Ricardo Villarosa. (ECF No. 1.) Defendants are either board members or administrators at Wayne State University.

Discovery is complete, and Defendants have moved for summary judgment. (ECF No. 45.) Plaintiffs have moved for partial summary judgment and for a permanent injunction. (ECF No. 47.) For the reasons provided below, the court will grant Plaintiffs' motion and grant in part and deny in part Defendants' motion.

## I.   BACKGROUND

The following facts are taken from the record presented by both parties, and each material fact is either agreed upon or lacks contradictory evidence.

Plaintiff InterVarsity Christian Fellowship/USA is a religious organization that conducts outreach and religious ministry throughout the United States on over 600 college campuses. (ECF No. 59, PageID.2712.) Plaintiff InterVarsity Christian Fellowship Wayne State Chapter is a chapter of the organization. (*Id.*) It has been present on Wayne State's campus as a student organization since the 1930s. (*Id.*)

The professed purpose of Plaintiffs' organization is to "establish and advance . . . communities of students and faculty who follow Jesus as Savior and Lord." (*Id.*) Plaintiffs' members meet weekly for services and bible study; they also run outreach programs and prayer vigils, and host campus conferences. (*Id.*, PageID.2713.)

Plaintiffs impose certain limitations on which students can become leaders of the campus group. Students seeking leadership positions must agree with Plaintiffs' "Doctrine and Purpose Statements," "exemplify Christ-like character, conduct and leadership," and describe their Christian beliefs. (*Id.*; ECF No. 47-48, PageID.2310.) Prospective leaders of the group are given training in preparation "for serious spiritual responsibilities." (ECF No. 47-48, PageID.2312; ECF No. 59, PageID.2714-15.) They must undergo an apprenticeship period where the students "work with InterVarsity

ministry staff to develop their skills and prepare to lead Bible studies and provide religious teaching and spiritual guidance to other members." (ECF No. 47-48, PageID.2299; ECF No. 59, PageID.2714-15.) Group leaders, also called "Christian Leaders," lead students and members in weekly prayer, Bible studies, and worship. (ECF No. 47-48, PageID.2299; ECF No. 59, PageID.2714-15.) The leaders organize and lead other spiritual activities on campus, such as outreach events, prayer vigils, and religious counsel for individual students. (ECF No. 47-48, PageID.2301; ECF No. 59, PageID.2716.)

Plaintiffs' constitution states student leadership positions are "distinct religious role[s]" which involve "significant spiritual commitment." (ECF No. 59, PageID.2715; ECF No. 47-49, PageID.2310-14.) Student leaders are the "primary means" by which Plaintiffs "minister[] on campus." (ECF No. 59, PageID.2715-16; ECF No. 47-48, PageID.2301.)

Plaintiffs operated as one of many registered student organization ("RSO") on Wayne State's campus. (ECF No. 59, PageID.2716-17.) Other RSOs included fraternities, sororities, and club sports teams. (*Id.*, PageID.2717.) Being an RSO brings many benefits. These include the ability to reserve free or reduced-price meeting spaces on campus; access to tables in the college's main Student Center to recruit new members; the ability to apply for funding from the school; access to special lockers; the opportunity to participate in the two main campus recruiting events, FestiFall and WinterFest; inclusion on a list of official student groups posted on the school's website; and access to an online school platform used to communicate with students and post a schedule of events. (*Id.*, PageID.2719-20; ECF No. 47-45, PageID.2138-39.)

To become an RSO, a group must submit to the university information on its members and its constitution or operating agreement. (ECF No. 59, PageID.2720-21.) An RSO must register annually; groups are required to update student information and file their current constitution. (*Id.*, PageID.2721.)

Defendant Villarosa, Wayne State's Coordinator of Student Life, evaluates group submissions and determines if groups qualify for status as an RSO. (*Id.*, PageID.2721-22.) Part of the evaluation is determining whether a group's leadership and membership criteria violate Wayne State's non-discrimination policy. The policy states:

> [Wayne State] embraces all persons regardless of race, color, sex (including gender identity), national origin, religion, age, sexual orientation, familial status, marital status, height, weight, disability, or veteran status and expressly forbids sexual harassment and discrimination in hiring, terms of employment, tenure, promotion, placement and discharge of employees, admission, training and treatment of students, extracurricular activities, the use of University services, facilities, and the awarding of contracts

(ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2722-23.)

There are no written exceptions to the policy. However, the policy states that the university is not precluded "from implementing those affirmative action measures which are designed to achieve full equity for minorities and women." (ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2724.)

Plaintiffs' chapter president submitted the InterVarsity constitution to Wayne State in March 2017. (ECF No. 59, PageID.2725.)  The constitution was not materially different from previous InterVarsity constitutions, or constitutions InterVarsity used at other public universities such as the University of Michigan and Central Michigan University. (*Id.*, PageID.2725-26.) It allowed all students to join the group as members,

but leadership positions were limited to those who agree with Plaintiffs' statement of faith. (*Id.*, PageID.2726.)

On March 30, 2017, Plaintiffs' president received an online message from Wayne State stating the RSO application has been complete and her position as president was accepted. (*Id.*) However, the next day, on March 31, 2017, Defendant Villarosa sent the group president a message stating: "Neither membership, nor officer requirements may violate the university anti-discrimination policy—please amend the officer requirements accordingly and resubmit." (*Id.*, PageID.2726.) The online system for RSO submissions was new, and Plaintiffs' chapter president overlooked the second message. (*Id.*, PageID.2724, 2727.) Plaintiffs continued to be treated as an RSO through the spring semester of 2017 and into the fall. (*Id.*, PageID.2727.)

On September 14, 2017, Plaintiffs' chapter president submitted a renewed RSO application for that school year. (*Id.*, PageID.2729.) Defendant Villarosa responded on September 15, 2017, asking the group to contact him regarding its membership and officer requirements. (*Id.*, PageID.2729.) On October 3, 2017, Defendant Villarosa sent a second message stating that Plaintiffs' officer requirements violated the school's non-discrimination policy. (*Id.*) Plaintiffs' chapter president talked to Defendant Villarosa in person. (*Id.*, PageID.2729-30; ECF No. 47-48, PageID.2304.) At the meeting, Plaintiffs' chapter president "made [the] point" that "other groups on campus ask their members or leaders to share their views" and "other groups on campus . . . seem to violate the non-discrimination policy." (ECF No. 59, PageID.2729-30; ECF No. 47-48, PageID.2304.) The chapter president followed up the meeting with an email to Defendant Villarosa on October 17, 2017, requesting that he obtain confirmation of the decision to deny RSO

status from Wayne State's general counsel. (ECF No. 59, PageID.2729-30.) The chapter president asked Defendant Villarosa why he was "applying the non-discrimination policy in this way particularly as it seem[ed] to be a violation of [Plaintiffs'] first amendment rights of religious expression." (ECF No. 47-48, PageID.2320.)

The general counsel responded via letter on October 23, 2017, indicating the application of the non-discrimination policy was appropriate and legal. (ECF No. 59, PageID.2730-31.) On October 26, 2017, Wayne State revoked Plaintiffs' status as an RSO and cancelled its pending events on Wayne State's campus. (*Id.*, PageID.2732-33; ECF No. 47-22, PageID.1367-68.)

There is no genuine dispute that other RSOs at Wayne State limited membership and leadership, during and after the timeframe of Plaintiffs' deregistration, based on categories included in the non-discrimination policy. Unlike Plaintiffs, those groups were not found in violation of the policy. Specifically, club sports teams on Wayne State's campus excluded members who did not fall within their prescribed sex or gender identity categories. (*Id.*, PageID.2738-39.) Also, Greek letter fraternities and sororities excluded members and leaders based on their sex and gender identity. (*Id.*, PageID.2740-43.) The Iraqi Student Organization required that its leaders be "dedicated Iraqi student[s]." (*Id.*, PageID.2744-45.) The Student Veterans Organization limited membership and leadership positions to those who were veterans, veteran's dependents, and Reserve Officers' Training Corps ("ROTC") members. (*Id.*, PageID.2747.)

At the time of Plaintiffs' deregistration and following it, other religious groups limited leadership to those who shared the groups' religious principles. The Newman

Catholic Center at Wayne State required leaders be "faithful," and required that leaders engage in "prayerful Discernment." (*Id.*, PageID.2750.) The Muslim Student Association stated in its student group registration that it would remove leaders for "[v]iolat[ing] an Islamic principle that deems him/her unworthy to serve as a Muslim leader on campus." (*Id.*, PageID.2751.) The Rising, another religious group, limited leadership to students who "hold the same beliefs as our organization." (*Id.*, PageID.2750.) The Faholo Campus Ministry required leaders to "agree" with "denominational faith statements"; Ratio Christi required that leaders "profess a personal relationship with Jesus Christ"; The Eternal Message mandated that leaders "follow[] its mission" to "introduce people to Islam"; the Coptic Christian Club required leaders be "Coptic Orthodox Christian"; and Virtuous 31 required that its leaders "really love God." (*Id.*, PageID.2751-52.)

Wayne State also permitted a group affiliated with the New Life Church to become an RSO. (*Id.*, PageID.59, PageID.2754-55.) Members and leaders of the group were required to "advance the efforts of the New Life student org," which included "help[ing] students who wish to pursue God develop a deeper understanding and closer relationship with Jesus."[1] (*Id.*)

---

[1]     Defendants did apply the non-discrimination policy to some religious groups. "Christians on Campus," an RSO that submitted a registration form in 2017, was contacted by Defendant Villarosa for the group's requirement that its leaders "be . . . believer[s] in Jesus Christ and uphold the Bible as the complete divine revelation." (ECF No. 55, PageID.2516-17.) Unlike Plaintiffs, Christians on Campus did not attempt to defend its leadership requirement, and removed it. (*Id.*) In 2018, however, the RSO was permitted include the same limitation. (ECF No. 59, PageID.2751, 53.) In 2016, Defendant Villarosa also contacted Virtuous 31 for limiting membership to women. (ECF No. 55, PageID.2514-15.) Virtuous 31 capitulated and removed the sex-based limitation, while retaining the requirement that its leaders "really love God." (*Id.*)

Secular groups both during and after Plaintiffs' deregistration were permitted to limit membership and leadership based on agreement with their mission principles. The student group "Reunite and Organize in Spite of Everything" mandated that members "share with us the goal of African unification." (*Id.*, PageID.2755-56.) Leaders were required to "be actively working in the community to advance the African race." (*Id.*) The Macedonian-American Student Association required that members "agree with the goals of the group," which included "bring[ing] Macedonian-American students together in order to preserve and enrich [the] ethnicity." (*Id.*, PageID.2757-58.) The Secular Student Alliance sought "[t]o promote secular values" and requires that leaders "have shown commitment to the group." (*Id.*, PageID.2757.) Members were barred from "preaching." (*Id.*)

Finally, under Wayne State's non-discrimination policy, RSOs were categorically permitted to exclude members based on ethnicity, political viewpoint, ideology, physical attractiveness, and grade point average. (*Id.*, PageID.2759.) For instance, Young Americans for Freedom, a conservative political organization, required members to agree with the group's "principles," and the International Youth and Students for Social Equality, which "fight[s] for a Marxist perspective," required members be "in full agreement with the [group's] statement of principles."[2]  (*Id.*)

---

[2]     Defendants did at times contact non-religious RSOs for alleged violations of the non-discrimination policy. Defendant Villarosa messaged the Saudi Student Association for limiting membership to Saudi students. (ECF No. 55, PageID.2512.) In August 2017, Defendant Villarosa contacted the Indian Student's Association for limiting membership to students with "Indian origin." (*Id.*, PageID.2513-14; ECF No. 45-18, PageID.997.) However, during the winter semester of 2017, the Indian Student's Association submitted a constitution with the same membership requirements and Defendant Villarosa did not identify a conflict with the non-discrimination policy. (ECF No. 55, PageID.2513-14; ECF No. 55-9, PageID.2638.) In addition, the group's 2018

After Plaintiffs' RSO status was revoked, they lost access to several benefits. Plaintiffs were no longer permitted to hold meetings at low or no cost using spacious and convenient locations on campus. (*Id.*, PageID.2764-65.) The group incurred expenses running into thousands of dollars over the course of the semester to rent smaller and less accessible rooms. (*Id.*) Some meetings and events were cut back. (*Id.*, PageID.2766-67.) Specifically, Plaintiffs reduced outreach tables at the school's student center and did not host introductory "meet-and-greets." (*Id.*; ECF No. 47-47, PageID.2254.) Plaintiffs' group was removed from the official Wayne State student organizations list, and members received questions from other students on the group's status. (ECF No. 59, PageID.2767-68; ECF No. 47-47, PageID.2259.) Plaintiffs lost the ability to communicate with students through Wayne State's online student organizations platform and could not advertise its meetings like other RSOs. (ECF No. 59, PageID.2767-68; ECF No. 47-47, PageID.2259, 2262.)

The next major on-campus recruiting event was the 2017-18 WinterFest. (ECF No. 59, PageID.2770.) Plaintiffs were required to pay a fee, were excluded from a ballroom that hosted the tables of registered student groups, and were relegated to outside vendor status at a table on a different floor near a Starbucks coffee shop. (*Id.*, PageID.2770-71; ECF No. 47-47, PageID.2255; ECF No. 47-48, PageID.2306.)

Plaintiffs filed the instant lawsuit on March 6, 2018, before the United States District Court for the Western District of Michigan. On March 8, 2018, Defendants

---

registration stated without issue that its purpose was to host events for "Indian students." (ECF No. 55, PageID.2514.) There is no record that these groups resisted Defendants' application of the non-discrimination policy to them, pointed out Defendants' exceptions and non-enforcement for other groups, or brought First Amendment claims in court.

decided to recertify Plaintiffs as an official student group, stating that Plaintiffs' group "is committed to welcoming and including all students . . . and the university will not interfere in the group's leadership selection." (ECF No. 59, PageID.2773-74.) However, Defendants did not alter their non-discrimination policy and they still contend that Plaintiffs are in violation. (*Id.*, PageID.2774-75; *see, e.g.*, ECF No. 45, PageID.753.)

The case was transferred to this court on February 5, 2019. Defendants moved to dismiss the complaint, (ECF No. 6), and Plaintiffs moved for partial summary judgment. (ECF No. 7.) On September 20, 2019, the court granted in part and denied in part Defendants' motion to dismiss. (ECF No. 26.) The court dismissed two claims brought under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). (*Id.*, PageID.514.) In addition, the court found Plaintiffs' motion for summary judgment premature and denied it without prejudice. (*Id.*)

The parties completed discovery, and, on October 22, 2020, they filed cross motions for summary judgment. (ECF Nos. 45, 47.) Plaintiffs also seek a permanent injunction. (ECF No. 47.)

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence]

negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

Plaintiffs move for summary judgment on their claims brought under the Religion Clauses of the First Amendment and internal management rights (Counts 1 and 2), free speech rights (Counts 7 and 8), freedom of association rights (Count 6), freedom of assembly rights (Count 9), free exercise rights (Counts 3 and 4), free exercise rights under the Michigan Constitution (Count 15), and the Establishment Clause of the First Amendment (Count 5). (ECF No. 47.) Defendants move for summary judgment on the basis of qualified immunity and on all remaining counts of the complaint. (ECF No. 45.) Those that remain include claims brought under free speech rights guaranteed by the

Michigan Constitution (Counts 16-19), the Equal Protection Clause of the Fourteenth Amendment (Count 10), the Due Process Clause of the Fourteenth Amendment (Count 20), and Michigan's ELCRA (Count 13). The court will address each issue in turn.

### A. Religion Clauses and Internal Management Rights (Counts 1 and 2)

The parties seek summary judgment on Plaintiffs' claims under the Religion Clauses of the First Amendment and internal religious management rights. The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. The amendment is "applicable to the States through the Fourteenth Amendment." *Virginia v. Black*, 538 U.S. 343, 358 (2003).

### 1. Application as a Constitutional Right

The first argument Defendants pose is that the right to religious internal management can be applied only as an affirmative defense, predominantly in the employment context. (ECF No. 45, PageID.738.) Defendants argue that the First Amendment's ministerial protections apply only to judgments issued by the judiciary and cannot support enforcement claims brought through 42 U.S.C. § 1983. (*Id.*)

The Supreme Court has established in no uncertain terms that the ministerial exception is founded on a larger and deeply ingrained right of religious organizations to select their leaders and messengers. In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 177-78 (2012), a Lutheran Church operated a school in Redford, Michigan, and terminated a teacher—deemed in these circumstances to be a minister of the church—after she developed narcolepsy, took leave for several months during a school year, and attempted to return to work after the

Church had hired a replacement teacher. The teacher filed suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Michigan anti-discrimination law, seeking compensation and reinstatement. *Id.* at 179-80.

The Supreme Court held that the suit was barred under the First Amendment. *Id.* at 196. In doing so, the Court recognized broadly that "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.* 181. The Court detailed the historical basis for this right. The Magna Carta in 1215 imposed limitations on the King of England prohibiting him from interfering with the English church's "freedom of elections." *Id.* at 182. However, in subsequent centuries, the English monarch was made "the supreme head of the Church" and was given "authority to appoint the Church's high officers." *Id.* In 1662, the English government created a law requiring that ministers "formally assent[] to prescribed tenets and pledge[] to follow [approved] mode[s] of worship." *Id.* It was in this context that the first settlers of the United States fled England to ensure greater freedom in religious and community belief and practice. "[T]he Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship." *Id.* "In Virginia . . . the law vested the governor with the power to induct ministers presented to him by parish vestries . . . but the vestries often refused to make such presentations and instead chose ministers on their own." *Id.* at 183. In fact, when the colonies enacted laws that limited the ability of English officials to control and direct the appointment of ministers, "[a]uthorities in England intervened, repealing those laws as inconsistent with the rights of the Crown." *Id.* at 183.

The *Hosanna-Tabor* Court recognized that it was "against this [historical] background that the First Amendment was adopted." *Id.* "By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices." *Id.* at 184. The Court then reiterated explicitly that the First Amendment, in its original understanding, was created to "prevent[] the Government from appointing ministers . . . [and] prevent[] it from interfering with the freedom of religious groups to select their own." *Id.*

James Madison's actions in the early republic conformed with this original meaning. He repeatedly opposed executive and legislative policies that allowed the government to influence the "selection of ecclesiastical individuals," arguing that such policies "violate[d] . . . the Constitution." *Id.* at 184-85. The *Hosanna-Tabor* Court again concluded simply that "it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185.

In *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060-61 (2020), the Supreme Court recently reviewed lawsuits brought by teachers against religious schools for alleged discrimination based on age and disability (breast cancer). As with *Hosanna-Tabor*, the Court recounted the historical roots of the First Amendment and examined how the ministerial exception fell within the larger right of religious organizations to select preachers. The Court stated, unambiguously:

> Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute

one of the central attributes of an establishment of religion. The First
Amendment outlaws such intrusion.

(…)

[I]t is instructive to consider why a church's independence on matters of
faith and doctrine requires the authority to select, supervise, and if
necessary, remove a minister without interference by secular authorities.
Without that power, a wayward minister's preaching, teaching, and
counseling could contradict the church's tenets and lead the congregation
away from the faith.

*Id.* at 2060. The Court recognized that *Hosanna-Tabor's* holding as to employment

discrimination claims was founded in "the general principle of church autonomy to which

we have already referred: independence in matters of faith and doctrine and in closely

linked matters of internal government." *Id.* at 2061. To support this principle, the Court

recounted the historical underpinnings of the First Amendment: British and colonial

control of non-conforming ministers, religious belief and practice. *Id.* at 2061-62.

These two foundational Supreme Court precedents cannot be fairly read to first

recognize a religious organization's absolute right to appoint its ministers while at the

same time prohibiting the organization any means by which it may seek to terminate,

redress, or remedy even the most blatant of government restrictions and incursions into

such ministerial business. That is, other than in the one, narrow form of presenting an

affirmative defense in the event it were to face an employment lawsuit implicating its

internal ministerial affairs.

The Court repeatedly and unequivocally stated the First Amendment creates a

broad right against *any* government intrusion into a religious organization's internal

affairs. *Hosanna-Tabor* made clear that the right applied against "the government,"

without qualification, three separate times. 565 U.S. at 181, 184, 185. *Our Lady of*

15

*Guadalupe School* held the right protected against "interference by secular authorities." 140 S. Ct. at 2060. All government, no matter what branch and no matter what means may be used to conduct religious interference, undeniably falls within the canopy of "secular authorit[y]." *Id.*

This interpretation falls within the original understanding of the First Amendment. As the Supreme Court recounted in both *Hosanna-Tabor* and *Our Lady of Guadalupe School*, the First Amendment was created in reaction to a long and storied history of the British monarch and the British Parliament enacting laws that force religious practitioners to receive their teachings only from "approved" sources. Specifically, the British crown was acting to consolidate the control of the English church over religious dissidents and non-conformists, most notably Catholics and Puritans. It should be no wonder that religious outsiders fled England and established colonies in North America, establishing new settlements in such places as Plymouth, Massachusetts. "Many of the British North American colonies that eventually formed the United States of America were settled in the seventeenth century by men and women, who, in the face of European persecution, refused to compromise passionately held religious convictions and fled Europe." *Religion and the Founding of the American Republic*, The Library of Congress, https://www.loc.gov/exhibits/religion/rel01.html (last visited Mar. 30, 2021).

The First Amendment was crafted in part to protect religious diversity and allow divergent religionists, who were often the subject of repression and violence, room to create and mold their own spiritual lives and their society. Paramount to the freedom to establish independent churches is the ability to select those who will lead and spread the religious message of the organization. The repressive actions evidenced in the

16

historical record of the First Amendment are laws enacted by a legislature or executive and enforced directly against religious organizations and believers by the executive. The British Crown and the British Parliament, as well as colonial governments, enacted laws that regulated the appointment of ministers, and British police and military officers enforced the law against subjects and religious groups that did not comply. *See Hosanna-Tabor*, 565 U.S. at 181-85; *Our Lady of Guadalupe School*, 140 S. Ct. at 2061-62; *see also, e.g.*, *The Act of Supremacy, 1534*, National Archives UK, http://www.nationalarchives.gov.uk/pathways/citizenship/rise_parliament/transcripts/henry_supremacy.htm (last visited Mar. 30, 2021) (text of an edict from King Henry VIII of England asserting himself "to be supreme hede of the Churche of England" and "so . . . recognysed by the Clergy of the Realme"); Robert Tombs, *The English and Their History* 166-69 (2014) (describing King Henry VIII's mandate that "clergy accept the Act of Supremacy," the internment of dissenting religious leaders in the Tower of London, and the eventually dissolution and looting of monasteries). These historical events underlie the formation of the American republic and the original meaning of the First Amendment. *See Hosanna-Tabor*, 565 U.S. at 181-85; *Our Lady of Guadalupe School*, 140 S. Ct. at 2061-62; The Library of Congress, *supra*.

Congress passed § 1983 in the post-civil war era to allow individuals to vindicate their constitutional rights in the face of abusive, and often repressive, state governments. *See Owens v. City of Independence*, 445 U.S. 622, 623 (1980) (Section 1983 was designed "to provide protection to those persons wronged by the abuse of governmental authority and to deter future constitutional violations."); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 934 (1982) (quotations removed) (The law

served to "reenact the Constitution" for individual litigants against states.). The law

provides individuals a cause of action for constitutional violations. To bring a § 1983

claim, there is no requirement that individuals first risk civil or criminal liability at a court

proceeding. "[T]he § 1983 remedy *broadly* encompasses violations of federal statutory

as well as constitutional law." *Gean v. Hattaway*, 330 F.3d 758, 775 (6th Cir. 2003)

(emphasis added) (quoting *Maine v. Thiboutot*, 448 U.S. 1, 4-5 (1980)); *see also West

v. Atkins*, 487 U.S. 42, 48 (1988) (holding that, to obtain relief, a § 1983 plaintiff need

only show "[a] violation of a right secured by the Constitution and laws of the United

States" and "that the alleged deprivation was committed by a person acting under color

of state law"). Section 1983 explicitly gives private parties the right to sue officials for the

"deprivation of *any* rights, privileges, or immunities secured by the Constitution." 42

U.S.C. § 1983 (emphasis added). The court is aware of no exception in § 1983 for basic

First Amendment liberties, and Defendants do not present arguments to the contrary.

(*See* ECF No. 58, PageID.2697-98.)

It strains credulity to think that the First Amendment was enacted solely to protect

religious organization's internal management from the judiciary and private lawsuits.

The First Amendment and § 1983 were not designed to lay dormant until targeted

individuals and groups face a criminal or civil judgment. Substantial harm can befall a

disfavored group in the meanwhile. Individuals (or entities) can be harassed, fined,

punished, or even imprisoned in violation of the Constitution before having the

opportunity to present an in-court defense. *See, e.g., Ouza v. City of Dearborn Heights*,

969 F.3d 265, 271-73 (6th Cir. 2020) (finding that a § 1983 plaintiff had presented a

viable constitutional claim under the Fourth Amendment after the plaintiff was arrested

and released from custody the next day); *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 546 (6th Cir. 2012) (holding that a § 1983 plaintiff had stated a valid claim under the First Amendment where the plaintiff claimed that she was terminated from her job after reporting alleged public corruption and misuse of government funds); *District of Columbia v. Heller*, 554 U.S. 570, 573-74 (finding in favor of a § 1983 plaintiff who was denied a handgun registration by a local government office in violation of the Second Amendment). Many law-abiding individuals, for a variety of reasons, may not choose to risk the possibility of enforcement or a court judgment. They may refrain from engaging in protected activity all together, and First Amendment liberties would quietly lose use and purpose.

Defendants yet insist that a religious organization's right to select its own leaders and ministers cannot be enforced other than as a defense in court, primarily (if not exclusively) against private employment lawsuits. (ECF No. 45, PageID.737-38.) Defendants point to the lack of caselaw involving religious organizations directly suing a government actor alleging infringing executive or legislative actions taken against such an organization.[3] (*Id.*) The court observes that this may be because such executive and

---

[3]    Defendants assert unequivocally that "courts have consistently rejected affirmative claims brought under the ministerial exception." (ECF No. 45, PageID.736.) Yet Defendants cite only one case in support of this assertion: an out-of-circuit decision from the United States District Court of Iowa. *See Bus. Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885 (S.D. Iowa 2019). In *Business Leaders in Christ*, the court found that the University of Iowa violated the Constitution by requiring, to obtain status as a registered student group, a Christian organization to accept as its leaders students who did not agree with the organization's religious beliefs. *Id.* at 909. However, the court noted that there was not a dispute between an unwanted minister suing under the ADA like in *Hosanna-Tabor* and "decline[d] to extend" ministerial protections beyond the anti-discrimination context of *Hosanna-Tabor*. *Id.* at 904-905. Since the court had already found that the university's policies violated the Constitution, it provided only a brief analysis of ministerial protections. The court did not cite or analyze *Our Lady of*

legislative actions against religious groups more cleanly fit within the original meaning of the First Amendment's religion clauses and more clearly violate the Constitution. Governments may not be willing to act in such a way that is so obviously odious to the Constitution. As shown in the historical record, and as explained by the Supreme Court in *Hosanna-Tabor* and *Our Lady of Guadalupe School*, the eighteenth-century American colonists and the writers of the First Amendment feared government encroachments in far more contexts, and with far greater severity, than lawsuits and employment disputes.

Defendants fail to explain why federal courts would feel the need to erect such substantial barriers to private anti-discrimination suits, which largely seek money damages, but would allow a state government to directly influence a religious organization's internal management without the organizations ability to sue under § 1983. While a private actor may not be able to sue for sex discrimination, could a state government mandate that a church appoint women as priests and then fine the church and close services for non-compliance? Must members of the church risk jailtime or substantial fines at a court proceeding to vindicate their constitutional rights to internal management? Under the First Amendment, any and all government is prevented from "appointing ministers . . . [and] interfering with the freedom of religious groups to select their own." *Hosanna-Tabor*, 565 U.S. at 184. A religious group can vindicate its right to

---

*Guadalupe*; it did not consider the history and original meaning of the First Amendment; and it chose merely, given existing precedent, not to extend ministerial protections beyond the facts of *Hosanna-Tabor*. As the court here has explained, the right to internal management extends further than an affirmative defense in the employment context, and the court does not find persuasive for the facts in this case the District of Iowa's reasoning for internal management claims.

20

internal management through use of § 1983, and the right is not siloed to use as an affirmative defense.

Although the issue is not frequently litigated, Sixth Circuit precedent support the court's conclusion. In *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 837 (6th Cir. 2015), the court barred a sex discrimination lawsuit brought against Plaintiff InterVarsity Christian Fellowship/USA as an intrusion on its right to select its ministers. In concluding that the ministerial exception applied, the court stated that:

> The parties point[ed] to no historical example in which the founding generation permitted any arm of the federal government—including the judiciary—to order a religious organization to accept or retain in a ministerial position a person whom the organization deemed unfit for ministry. To the contrary, the historical practice has always been that the government cannot dictate to a religious organization who its spiritual leaders would be.

*Id.* at 835-36. The court held that First Amendment protections of ministerial appointment apply to "any arm of the federal government," in which the judiciary, and thus private litigants, are just a part. *Id.* "[T]he government," as a whole, is barred from interfering with a religious group's choice in spiritual leader. *Id.*

In *Commonwealth v. Beshear*, 981 F.3d 505, 510 (6th Cir. 2020), the court reviewed a First Amendment challenge brought directly against government officials in Kentucky for restrictions placed in response to the outbreak of the Coronavirus Disease ("COVID-19"). The plaintiffs alleged that the restrictions "intrude[d] into the autonomy of religious institutions and how they administer their religious missions." *Id.* at 510. The court reviewed the claim substantively. It recognized that the First Amendment "protects a church's autonomy with respect to matters of doctrine and church government," but held that "those [rights] are not affected" by the COVID-19 restrictions. *Id.* The Sixth

Circuit recognized religious organizations' basic First Amendment rights and analyzed the claim for a direct constitutional challenge against the government. The court gave no indication that those rights would apply only as an affirmative defense in the employment context.

The First Amendment provides religious organizations the right to select their own ministers, and, under the First Amendment and § 1983, organizations can sue the government for violating that right.

## 2.  The Merits of Plaintiffs' Claim

"[The] Religion Clauses bar the government from interfering with the decision of a religious group to [select] its ministers." *Hosanna-Tabor*, 565 U.S. at 181. To obtain the protection of the Religion Clauses, a party must show that it is a "religious group" and that the government has "interfer[ed]" with the selection of its "ministers." *Id.*; *Conlon*, 777 F.3d at 837 (analyzing whether Plaintiff InterVarsity Christian Fellowship/USA was a "religious group" and then reviewing whether an employee Plaintiff terminated was a "minister" sufficient to subject Plaintiff to Title VII liability).

### i.  Whether Plaintiffs Are a Religious Group

Plaintiffs provide uncontested evidence that they are a religious group. They provide outreach and religious ministry at hundreds of American colleges. (ECF No. 59, PageID.2712.) Plaintiffs' stated purpose is to "establish and advance . . . communities of students and faculty who follow Jesus as Savior and Lord." (*Id.*) It is undisputed that Plaintiffs conduct regular religious services for students on campus, hold bible study meetings to read and interpret scripture, and conduct outreach campaigns and prayer vigils. (*Id.*, PageID.2713.)

In *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007), *abrogated on other grounds*, *Hosanna-Tabor*, 565 U.S. at 195 n.4, the Sixth Circuit held that a religiously affiliated hospital was a religious group entitled to ministerial protections. The court held that, in order to obtain First Amendment protections, a group "need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization." *Id.* at 225. "A religiously affiliated entity is one whose mission is marked by clear or obvious religious characteristics." *Conlon*, 777 F.3d at 834. Plaintiffs may not fall within the traditional understanding of a church, but they are certainly similar to one. Plaintiffs have taken on an undeniably religious purpose and seek to advance a religious cause. As a matter of law, Plaintiffs have a "clear [and] obvious religious" mission. *Id.*; Fed. R. Civ. P. 56(a).

Sixth Circuit precedent supports the court's conclusion. In *Conlon*, 777 F.3d 829, an ex-employee brought a sex discrimination claim against Plaintiff InterVarsity Christian Fellowship/USA. The court noted that Plaintiff is "a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities," and the court concluded that Plaintiff is a "religious group under *Hosanna-Tabor*." *Id.* at 834.

## ii.  Whether Christian Leaders Are Ministers

Plaintiffs also provide uncontradicted evidence that student leaders, called "Christian leaders," qualify as ministers under the First Amendment. Plaintiffs place limitations on who may become a Christian leader. Applicants for the position must agree with Plaintiffs' "Doctrine and Purpose Statements," "exemplify Christ-like character, conduct and leadership," and describe their Christian beliefs. (*Id.*; ECF No.

47-48, PageID.2310.) Plaintiffs make it their explicit policy that Christian leaders are trained to take on "serious spiritual responsibilities." (ECF No. 47-48, PageID.2312; ECF No. 59, PageID.2714-15.) As part of an apprenticeship process, Christian leaders must "work with InterVarsity ministry staff to develop their skills and prepare to lead Bible studies and provide religious teaching and spiritual guidance to other members." (ECF No. 47-48, PageID.2299; ECF No. 59, PageID.2714-15.) Once they are given the title, it is undisputed that the student leaders must lead students and members in weekly prayer, Bible studies, and worship. (ECF No. 47-48, PageID.2299; ECF No. 59, PageID.2714-15.) They also conduct outreach activities, recruit other students to engage with Plaintiffs' religious beliefs, and hold public events. (ECF No. 47-48, PageID.2301; ECF No. 59, PageID.2716, 2719-20.) In essence, Plaintiffs' student leaders participate in proselytizing efforts and are Plaintiffs' chosen spiritual resource for students at Wayne State.

The Supreme Court has cautioned that there is no "rigid formula" for determining whether an individual qualifies as a minister. *Our Lady of Guadalupe School*, 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 190-91). "What matters, at bottom, is what [the individual] does." *Id.* at 2064. Ministers include an individual "who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id.* The Supreme Court noted that "[a] religious institution's explanation of [an individual's] role . . . is [an] important" consideration. *Id.* at 2066.

It is not contested that Plaintiffs' Christian leaders lead Plaintiffs' religious organization on campus. The leaders organize outreach campaigns and recruiting, and

lead weekly prayer, Bible studies, and worship. (ECF No. 47-48, PageID.2299, 2301; ECF No. 59, PageID.2714-16, 2719-20.) Christian leaders serve to advance the message of Plaintiffs' faith. In order to become a leader, applicants must agree with Plaintiffs' stated purpose, to "establish and advance . . . communities . . . who follow Jesus as Savior and Lord." (ECF No. 59, PageID.2714-15; ECF No. 47-48, PageID.2309-10.) Notably, Plaintiffs themselves assert that Christian leaders play important spiritual roles. They serve as the "primary means" by which Plaintiffs conduct outreach and ministry on Wayne State's campus. (ECF No. 59, PageID.2715-16.) Plaintiffs' Wayne State chapter president offered testimony to this effect. The president stated in an affidavit that, "[w]hile [leaders] received training and support from InterVarsity staff, student leaders are the ones who actually lead the Bible studies and the prayers, who do the one-on-one to ministry to our peers, who text and email our fellow students to remind them about upcoming meetings, to offer prayer, or to provide religious encouragement." (ECF No. 47-48, PageID.2301.) Defendants to not present evidence to contradict this testimony.

In *Hosanna-Tabor*, the Supreme Court held that a schoolteacher at a religious school was a "minister." 565 U.S. at 177-78. In doing so, the Court noted that that the teacher was given a "diploma of vocation," was titled "Minister of Religion," and was tasked with performing her job responsibilities "according to the Word of God." *Id.* at 191. The teacher's title also "reflected a significant degree of religious training followed by a formal process of commissioning." *Id.* Finally, the teacher "held herself out as a minister . . . by accepting [a] formal call to religious service," and the teacher's "job

duties reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 191-92.

Plaintiffs' Christian leaders similarly fit within the category of minister under the First Amendment. Although not explicitly titled "minister," the position is titled "Christian leader." It is hard to imagine a more explicitly religious title, and, in *Conlon*, the court only considered "whether the wording of the title conveys a religious—as opposed to secular—meaning." 777 F.3d at 834 (holding that "spiritual director" is a religious title). Notably, the Supreme Court in *Our Lady of Guadalupe School* held that lay schoolteachers who did not have the title of "minister" fell within the First Amendment's ministerial protections. 140 S. Ct. at 2066. The title of Christian leader undeniably conveys a religious meaning. Plaintiffs described the position as having "serious spiritual responsibilities." (ECF No. 47-48, PageID.2312; ECF No. 59, PageID.2714-15.) Christian leaders are required to perform these spiritual duties while "exemplif[ing] Christ-like character, conduct and leadership." (ECF No. 59, PageID.2713; ECF No. 47-48, PageID.2310.) To apply, students must "describe [their] relationship with Jesus Christ" and "[w]hat strengths, gifts, talents, or skills [they] believe God has given [them] for service." (ECF No. 47-48, PageID.2312-13.)

Christian leaders are also required to undergo mandatory religious training. There is no real dispute that Christian leaders undergo an apprenticeship period where the students "work with InterVarsity ministry staff to develop their skills and prepare to lead Bible studies and provide religious teaching and spiritual guidance to other members." (ECF No. 47-48, PageID.2299; ECF No. 59, PageID.2714-15.) Plaintiffs' Wayne State chapter presidents offered uncontradicted testimony that they attended

numerous training conferences and ministry programs to perform their roles as Christian leaders. (ECF No. 47-48, PageID.2300; ECF No. 47-49, PageID.2325-26.) While this training is not on par with the six-year training process the teacher undertook in *Hosanna-Tabor*, 565 U.S. at 191, the training of Christian leaders is nonetheless noteworthy. In fact, the Court in *Our Lady of Guadalupe School* held that a schoolteacher who had "less formal religious training" than the teacher in *Hosanna-Tabor*, and merely "attended a religious conference" on "incorporating God into the classroom," was a minister under the First Amendment. 140 S. Ct. at 2058, 2066.

Finally, like the teacher in *Hosanna-Tabor*, Christian leaders accept the call to religious service by agreeing to Plaintiffs' "Doctrine and Purpose Statements." (ECF No. 59, PageID.2713; ECF No. 47-48, PageID.2310.) Christian leaders explicitly assert that they will serve to "establish and advance . . . communities . . . who follow Jesus as Savior and Lord." (ECF No. 47-48, PageID.2309.) Plaintiffs' chapter presidents offered testimony describing their own roles as conducting "ministry." (ECF No. 37-48, PageID.2301 ("[Christian leaders] do the one-on-one to ministry to our peers."); ECF No. 47-49, PageID.2327 (Christian leaders spend their time "on religious ministry.").) Further, as described above, Christian leaders' job responsibilities are deeply religious. They recruit, hold religious outreach, and lead services. (ECF No. 47-48, PageID.2299, 2301; ECF No. 59, PageID.2714-16, 2719-20.) In fact, unlike the teacher in *Hosanna-Tabor*, 565 U.S. at 178, who "taught math, language arts, social studies, science, gym, art, and music," there is no material dispute that the vast majority of Christian leaders' responsibilities are religious in nature. (ECF No. 47-48, PageID.2301 ("The vast majority of my time [as a Christian leader] . . . was spent on religious matters such as Bible

27

studies."); ECF No. 47-49, PageID.2327 ("Almost 100% of my time [as a Christian leader] is spent on religious ministry.").)

It is not the court's role to judge or second guess a religious organization's choice of individuals to lead and promote its religious mission. "In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Our Lady of Guadalupe School*, 140 S. Ct. at 2066. The uncontested record shows that Plaintiffs' Christian leaders are highly religious positions that serve a leading role in advancing Plaintiffs' faith and mission on Wayne State's campus and, as a matter of law, Christian leaders are ministers under the First Amendment. *Id.* at 2062; Fed. R. Civ. P. 56(a).

### iii. Whether Defendants Interfered with Plaintiffs' First Amendment Rights

When courts have discussed a religious group's right to select its ministers, they have spoken in broad and categorical terms. In *Hosanna-Tabor* the Supreme Court stated unequivocally that the government is barred from "appointing ministers . . . [or] interfering with the freedom of religious groups to select their own." 565 U.S. at 184. In support of the holding, the Court cited the historical record, which included examples of prohibitions against the government playing even minimal roles in the appointment of spiritual leaders. *Id.* at 182-85. For instance, in 1806, a Catholic bishop asked the President's opinion on "who should be appointed to direct the affairs of the Catholic Church in the territory newly acquired by the Louisiana Purchase." *Id.* at 184. Despite the bishop reaching out to the government, and despite the bishop merely asking for the government's view on which religious leader should be appointed by the Catholic

Church, Madison stated without qualification that the government was constitutionally precluded "from rendering an opinion on the selection of ecclesiastical individuals." *Id.*

The Court in *Hosanna-Tabor* emphasized that the government cannot "contradict" a religious organization's choice of minister. *Id.* at 185. The Court explained that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188. The principles the Court articulated are wide-ranging and generally applicable. Even though the plaintiff in *Hosanna-Tabor* sought money damages against a religious organization, the Court held that "such relief would operate as a penalty on the Church" for selecting its ministers, which "would be no less prohibited by the First Amendment than an order overturning the [Church's choice in minister]." *Id.* at 194.

The Court in *Our Lady of Guadalupe School* similarly held that "*any* attempt by government to dictate or even to influence [internal religious matters] would constitute one of the central attributes of an establishment of religion." 140 S. Ct. at 2060. The Court did not qualify this holding by stating that any government influence must be substantial. It stated that any and all attempts to influence who can become a spiritual leader and spread an organization's religious message is unconstitutional. *Id.* Also, in *Conlon*, the Sixth Circuit held that a religious group's right to select ministers is not subject to waiver. 777 F.3d at 836. In doing so, the court held in no uncertain terms that

the "constitutional protection . . . is a structural one that *categorically* prohibits federal and state governments from becoming *involved* in religious leadership" selection and disputes. *Id.*

Defendants' policy influences Plaintiffs' selection of ministers in a profound way. Defendants are not attempting to impose minor costs on Plaintiffs' selections. Nor are they impacting Plaintiffs' choice in ministers in ways unrelated to major doctrinal issues. In *Hosanna-Tabor*, 565 U.S. at 177-81, or *Our Lady of Guadalupe School*, 140 S. Ct. at 2056-60, the government sought to enforce anti-discrimination law through the courts and punish sex, age, and disability discrimination that was not directly related to religious doctrine. Yet the Supreme Court repeatedly held this attempt violated the First Amendment. Here, Defendants have mandated that Plaintiffs accept as their ministers individuals who do not believe in Plaintiffs' religious beliefs. There is no dispute that Defendants have enforced Wayne State's non-discrimination policy against Plaintiffs because the group requires its Christian leaders to agree to Plaintiffs' statement of faith. (ECF No. 59, PageID.2729; ECF No. 47-48, PageID.2304 ("[A Wayne State administrator] informed me that our constitution's requirement that leaders affirm our statement of faith was inconsistent with the school's policy against religious discrimination."); ECF No. 47-42, PageID.2090 ("Your currently written officer requirements violate the University Non-Discrimination policy.").) Defendants are taking action against Plaintiffs because they do not allow non-believers, *who may be hostile to Plaintiffs' religious tenants*, to hold important spiritual offices. An avowed atheist that holds deep resentment toward the Christian faith must, under Defendants' policy, be given the opportunity to become a Christian leader.

But the ability of religious groups to select leaders who in fact agree with the religion is exactly what the First Amendment protects. It guarantees that religious organizations "control . . . the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 184. Defendants' actions strike at the heart of this constitutional guarantee. Defendants, in essence, have mandated that Plaintiffs allow an "unwanted minister," one who does not believe in Plaintiffs' "faith and mission," *Hosanna*-Tabor, 565 U.S. at 188, and one, who in "wayward . . . preaching, teaching, and counseling[,] could contradict the church's tenets and lead the congregation away from the faith." *Our Lady of Guadalupe School*, 140 S. Ct. at 2060. Such government intrusions are categorically barred by the Constitution. Inherently, Defendants' policy serves to "contradict" Plaintiffs' own choice in religious leadership on grounds of profound religious doctrine, *Hosanna*-Tabor, 565 U.S. at 185, and constitutes a real and effective "attempt . . . to influence" internal religious organization. *Our Lady of Guadalupe School*, 140 S. Ct. at 2060.

Defendants argue that violation of their non-discrimination policy would result in nothing more than the student group being removed as an RSO. They claim that this is a mere revocation of a government benefit. However, the record shows that the effect of Plaintiffs' delisting on its organization, and its ability to carry out its mission of ministering the Christian faith on Wayne State's campus, was significant. Plaintiffs could no longer obtain free and low-cost meeting spaces on campus, and they were relegated to less attractive spaces when any spaces were available. (ECF No. 59, PageID.2719-20, PageID.2764-65; ECF No. 47-45, PageID.2138-39.) Unlike RSOs, Plaintiffs could not use tables in Wayne State's central Student Center to run recruiting events, they

could not apply to school funding, and they could not access the school web systems used to communicate with students about events and recruiting. (ECF No. 59, PageID.2719-20; ECF No. 47-45, PageID.2138-39.) Further, Plaintiffs were barred from participating in the main school-sponsored recruiting event, WinterFest. (ECF No. 59, PageID.2719-20; ECF No. 47-45, PageID.2138-39.)

Plaintiffs' student leaders provided uncontested testimony that being delisted by the school and having to conduct outreach outside the normal venues of an RSO "sent a message that [Plaintiffs] [were] an outsider" and "[t]hat stigma made [Plaintiffs'] recruiting efforts less effective." (ECF No. 47-48, PageID.2306; ECF No. 47-49, PageID.2328 ("Missing out on talking to students at WinterFest has made it harder to recruit new members for our chapter.").) In fact, Plaintiffs' members were asked if Plaintiffs "were . . . a real student organization." (ECF No. 47-47, PageID.2259.)

There is no real dispute that Plaintiffs spent hundreds of thousands of dollars to mitigate these adverse actions. (ECF No. 59, PageID.2764-65.) Recruiting events and group meetings were cut back. (*Id.*, PageID.2766-67.) To have any presence at WinterFest, Plaintiffs were required to purchase their own table as an outside vendor, and they were placed on an entirely different floor in front of a Starbucks, away from recognized student groups. (*Id.*, PageID.2770-71; ECF No. 47-47, PageID.2255; ECF No. 47-48, PageID.2306.)

The First Amendment categorically prohibits government attempts to influence or impose unwanted ministers on religious groups. Yet the parties agree that the only reason why Defendants took these negative actions against Plaintiffs was because Plaintiffs refused to allow appointment of ministers who did not agree with Plaintiffs' key

religious tenants. No religious group can constitutionally be made an outsider, excluded from equal access to public or university life, simply because it insists on religious leaders who believe in its cause. The involvement of government benefits is not a material consideration in the court's inquiry. Moreover, Plaintiffs offer undisputed evidence that students who have failed to comply with Wayne State's "statutes prohibiting discrimination," including Defendants' non-discrimination policy, could be subject to discipline. (ECF No. 55, PageID.2497; ECF No. 45-5, PageID.809.) Defendants' own policy documents permit Defendants to suspend, expel, demand restitution, and impose a transcript disciplinary record on students who do not comply with the school's non-discrimination stance. (ECF No. 55, PageID.2497; ECF No. 45-5, PageID.810.) The First Amendment does not require that Plaintiffs' members choose between risking their continued access to public education and their right to select spiritual leaders who share their beliefs.

The Constitution bars "any attempt . . . even to influence," *Our Lady of Guadalupe School*, 140 S. Ct. at 2060, to "becom[e] involved in," *Conlon*, 777 F.3d at 836, or to "contradict," *Hosanna-Tabor*, 565 U.S. at 185, a religious groups' leadership selection. The established record shows Defendants did so in this case. Defendants' actions have "operate[d] as a penalty" on Plaintiffs' exercise of religious rights, *Hosanna-Tabor*, 565 U.S. at 194, and, as a matter of law, Defendants violated the Religion Clauses of the First Amendment. Summary judgment in favor of Plaintiffs is warranted. Fed. R. Civ. P. 56(a).

## B.  Free Speech Rights (Counts 7 and 8) and Freedom of Association Rights (Count 6)

The parties move for summary judgment on Plaintiffs' free speech and freedom of expressive association claims. The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

The freedom of speech is among the most fundamental personal rights and liberties guaranteed by the Constitution. "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Black*, 538 U.S. at 358 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919)). "The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." *Id.*

"[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas. . . . Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association like a regulation that forces the group to accept members it does not desire." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000) (quotations removed). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010) (quoting *Dale*, 530 U.S. at 648).

34

"[T]here can be no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (*Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981)). The court will first address the free speech claim and then turn to the freedom of association claim.

**1.  Free Speech**

"The Supreme Court has adopted a forum analysis for use in determining whether a state-imposed restriction on access to public property is constitutionally permissible." *Kincaid*, 236 F.3d at 347 (quoting *United Food & Com. Workers Union v. Sw. Ohio Reg'l Transit*, 163 F.3d 341, 349 (6th Cir. 1998)). When "school authorities have by policy or by practice opened [their] facilities for indiscriminate use by the general public . . . or by some segment of the public" for expressive activities, the school has created a public forum. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). Those who have access to the facilities, such as student groups, are given free speech protections under the First Amendment. *See Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679 (2010) (reviewing access for registered student groups on a law school's campus under a forum analysis); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (analyzing the denial of school resources for a student group under the Court's forum doctrine).

When the government has "reserved a forum for certain groups or for the discussion of certain topics," it has created a "limited public forum." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). "In a limited public forum, the government is not required to and does not allow persons to engage in every

type of speech." *Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir. 2019) (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)). Here, the undisputed facts show that Defendants approve and allow groups on Wayne State's Campus to become RSOs, thus providing them access to numerous school benefits. (ECF No. 59, PageID.2720-21.) Those benefits, such as meeting rooms and recruiting events, are used for expressive activity. (*Id.*, PageID.2719-20; ECF No. 47-45, PageID.2138-39.) Consequently, the RSO program is a limited public forum. *See Martinez*, 561 U.S. at 679 (considering a registered student organization program a limited public forum); *Rosenberger*, 515 U.S. at 829-30 (finding access to school facilities for student groups as a limited public forum); *Kincaid*, 236 F.3d at 354 (holding that the creation of a university yearbook was a limited public forum).

As a limited public forum, Defendants cannot discriminate against groups or individuals based on the speech and advocacy in which they intend to participate. In order to preserve the limited purpose of a public forum, the government can reserve the forum "for certain groups or for the discussion of certain topics." *Rosenberger*, 515 U.S. at 829-30. The government can engage such content discrimination so long as it "preserves the purposes of that limited forum." *Id.* However, the government "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum . . . nor may it discriminate against speech on the basis of its viewpoint." *Id.*; *accord Martinez*, 561 U.S. at 685; *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg. Transp.*, 978 F.3d 481, 498 (6th Cir. 2020) (Viewpoint discrimination, where the state "permits some private speech on the subject and only disfavors certain points of view," is an "egregious form of content discrimination.").

### i.  Reasonableness

Defendants' policy to prevent Plaintiffs from restricting their Christian leaders to those who agree with their faith was not "reasonable in light of the purpose served by [Defendants'] forum." *Rosenberger*, 515 U.S. at 829. There is no dispute that the purpose of Wayne State's RSO program is to encourage development of diverse communities and enhance student engagement. Wayne State's express mission for establishing the RSO program is to "support student intellectual growth and maturity through promoting ethical development, appreciating diversity, encouraging civic engagement, providing leadership development, and supporting the establishment of meaningful interpersonal relationships." (ECF No. 45-8, PageID.849; ECF No. 59, PageID.2716-17.) Wayne State's Dean of Students explained this purpose when testifying that "when a student is connected to something or some things or someone on campus, the data will show you that those students retain at a higher rate and graduate at a higher rate." (ECF No. 47-45, PageID.2139.) Having groups in which students can belong, learn from each other, and share experiences from like-minded peers is undeniably beneficial.

Yet in this case, Defendants enforced a non-discrimination policy to prevent a religious organization that seeks to spread a religious message from limiting its Christian leaders to followers of Plaintiffs' religious beliefs. Undisputed facts show that Plaintiffs are a devout religious organization whose primary purpose is to "establish and advance" communities "who follow Jesus as Savior and Lord." (ECF No. 59, PageID.2712.) Plaintiffs require that their Christian leaders agree with Plaintiffs' religious doctrine, "exemplify Christ-like character, conduct and leadership," and hold

"serious spiritual responsibilities," including ministering Plaintiffs' faith on campus. (ECF No. 47-48, PageID. 2299, 2310, 2312; ECF No. 59, PageID.2714-15.) Plaintiffs assert that "[s]tudents cannot associate around hidden beliefs," and Plaintiffs, as a religious group, "cannot survive without leaders who agree with and promote its beliefs." (ECF No. 47, PageID.1135; *see also* ECF No. 47-48, PageID.2306-07 (Plaintiffs' student leader: "The reason why we've been able to be a consistent religious ministry for 75 years at Wayne State is that our leaders have agreed with our fundamental religious purpose and beliefs. And if we were forced to end that requirement, our group would quickly lose its Christian identity.").) Defendants' coordinator for student organizations apparently believes Plaintiffs have a point. The coordinator provided uncontradicted testimony that "requiring [Plaintiffs] to have a leader who doesn't share its faith could change the nature of [Plaintiffs'] organization" as a Christian advocacy group. (ECF No. 47-46, PageID.2224.)

Based on the undisputed record, as a matter of law Defendants' decision to revoke Plaintiffs' RSO status was arbitrary, inconsistent, and not reasonably related to the purpose of the RSO program.

Substantial Sixth Circuit precedent supports this finding. In *Kincaid v. Gibson*, a university funded the production and distribution of a student yearbook; the yearbook was written by students with limited involvement from university administrators. 236 F.3d at 344-45. The student who created the yearbook for one school year took a creative approach to the project and selected her own physical material to attach to the yearbook (foil), and crafted the yearbook based on a theme she thought exemplified the times (uncertainty). *Id.* at 345. The university's vice president for student affairs believed

the yearbook was inappropriate; it did not use the school's colors, its photos lacked captions, it was too short, and it discussed current events not related to the university. *Id.* The administrator confiscated the yearbook, refused to publish it, and hid the copies away for several years. *Id.*

The Sixth Circuit reviewed the university's actions under a forum analysis and held that the student yearbook was a limited public forum. *Id.* at 354. The court reviewed the record and determined that the university's actions were not reasonably related to the forum's purpose. *Id.* at 355-56. First, the court identified the yearbook's stated purpose, "to be a collection of pictures that depicted what went on at Kentucky State University, around the community that Kentucky State University set in, the state and the world." *Id.* at 355. Despite the university officials using their own judgment to determine that the student's yearbook was inappropriate, the court recognized that the yearbook at issue was a collection of photographs from "a wide range of individuals and events" and held that the student's chosen yearbook fulfilled the university's stated purpose. *Id.* Second, the court found that the university had violated its own policies in reviewing the yearbook by not consulting with student groups before confiscating the yearbook. *Id.* at 355-56. The university also allowed a yearbook for the following year that was not materially different that the yearbook at issue. *Id.* at 356. The Sixth Circuit concluded that the university's actions were "arbitrary and conflicted with the university's own stated policy." *Id.* at 355.

In this case, there is extensive evidence that Defendants' decision to revoke Plaintiffs' RSO status was arbitrary and symbolized an inconsistent application of the school's policy. *See id.* Defendants denied Plaintiffs the ability to become an RSO,

which undeniably provides significant benefits to student groups, (ECF No. 59, PageID.2719-20, PageID.2764-65; ECF No. 47-45, PageID.2138-39), because they refused to allow non-believers to become their Christian leaders. (ECF No. 59, PageID.2729; ECF No. 47-48, PageID.2304; ECF No. 47-42, PageID.2090.) Yet there is no material dispute that countless other RSOs did not allow students who oppose the groups' mission to become leaders. The Newman Catholic Center required its leaders to be "faithful," and required them to engage in "prayerful Discernment." (ECF No. 59, PageID.2750.) The Muslim Student Association stated in its constitution that it would remove leaders if they "[v]iolat[ed] an Islamic principle that deems him/her unworthy to serve as a Muslim leader on campus." (*Id.*, PageID.2751.) The Rising limited leadership to students who "hold the same beliefs as our organization." (*Id.*, PageID.2750.) The list goes on: the Faholo Campus Ministry required leaders to "agree" with "denominational faith statements"; Ratio Christi required that leaders "profess a personal relationship with Jesus Christ"; The Eternal Message mandated that leaders "follow[] its mission" to "introduce people to Islam"; the Coptic Christian Club required leaders be "Coptic Orthodox Christian"; and Virtuous 31 required that its leaders "really love God."[4] (*Id.*, PageID.2751-52.)

---

[4]     Defendants assert that some of the religious groups who applied religious leadership criteria were permitted to do so only after this lawsuit was initiated. (*See* ECF No. 59, PageID.2752 (mentioning the Coptic Christian Club's Christian requirement).) However, Defendants fail to explain how allowing some religious groups to overtly discriminate on the basis of religion now makes Defendants' decision in 2017 and 2018 to revoke Plaintiffs' RSO status solely on the basis of religious leadership criteria reasonable or necessary to uphold the purpose of the public forum. There is no evidence that the public forum has changed in any material way since 2017.

Non-religious RSOs also limited leadership based on student beliefs. "Reunite and Organize in Spite of Everything" mandated that all members, including leaders, "share with us the goal of African unification." (*Id.*, PageID.2755-56.) The Macedonian-American Student Association required that all members "agree with the goals of the group," which include "bring[ing] Macedonian-American students together in order to preserve and enrich [the] ethnicity." (*Id.*, PageID.2757-58.) The Secular Student Alliance sought "[t]o promote secular values" and required that leaders "have shown commitment to the group"; leaders and members were barred from "preaching." (*Id.*, PageID.2757.) The Young Americans for Freedom required members to agree with the group's "principles," and the International Youth and Students for Social Equality required members be "in full agreement with the [group's] statement of principles." (*Id.*, PageID.2759.)

Defendants granted all of these student groups the benefits of an RSO but denied them to Plaintiffs.

It is also established in the record that other groups violated the non-discrimination policy but retained RSO status. By permitting these groups to discriminate, Defendants were not following a policy that they assert was in force and binding on Plaintiffs. *See Kincaid*, 236 F.3d at 355-56. Club sports teams were permitted to exclude members who did not fall within the club's sex or gender identity category. (ECF No. 59, PageID.2738-39.) Fraternities and sororities excluded members and leaders based on sex and gender identity. (*Id.*, PageID.2740-43.) The Iraqi Student Organization required that its leaders be "dedicated Iraqi student[s]." (*Id.*, PageID.2744-45.) The Student Veterans Organization limited membership and leadership positions to

41

those who were veterans, veteran's dependents, and Reserve Officers' Training Corps ("ROTC") members.[5] (*Id.*, PageID.2747.) As described above, many religious groups conditioned leadership on profession of religious beliefs.

Finally, barring student groups from selecting leaders who subscribe to the group's beliefs does not comply with the purpose of RSOs. *See Kincaid*, 236 F.3d at 355. RSOs are designed to provide students a source of connection and community. (ECF No. 45-8, PageID.849; ECF No. 59, PageID.2716-17.)  As Wayne State officials recognize, involvement in RSOs increase college retention. (ECF No. 47-45, PageID.2139.) They allow groups with diverse beliefs, backgrounds, and experiences to develop and thrive. However, to have foster groups that are effective and which can attract members and spread and express the diversity of their chosen messages, for leadership positions, which usually carry with them significant responsibilities, student groups may feel the need to limit them to those who support the group's stated mission(s). (ECF No. 47, PageID.1135; ECF No. 47-46, PageID.2224; ECF No. 47-48, PageID.2306-07.) Such limitations help establish unity of purpose and help ensure real commitment from student leaders. This may be especially true of groups representing minority beliefs, perhaps such as Plaintiffs', which may be at greater risk of uninterested or even hostile peers. Reflecting these realities are the numerous RSOs on Wayne

---

[5]     Simply because Defendants actually applied the non-discrimination policy *at times* to *some* non-religious RSOs does not demonstrate that Defendants' policy was reasonable or neutral. (ECF No. 55, PageID.2512-14.) Defendants still indisputably allowed for numerous exceptions and non-enforcement for many RSOs while applying the policy against Plaintiffs in violation of the First Amendment. The sporadic application of the policy serves to emphasize its arbitrary and inconsistent nature.

State's campus that have and continue to discriminate based on belief, whether spiritual, political, or cultural.[6]

Furthermore, Defendants' own non-discrimination policy allows for exceptions "to achieve full equity for minorities and women." (ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2724.) The policy has been applied to the Student Veterans Organization, (ECF No. 55, PageID.2517-19), and Defendant Villarosa, Wayne State's Coordinator of Student Life, provided testimony without dispute that the school possesses no policy, list, or definition for which groups qualify as "minorities." (ECF No. 47-33, PageID.1975-76 ("[H]ow do you know who counts as a minority[?] . . . I don't know.").)  For a devout Christian group with around 20 to 35 members, (ECF No. 47-47, PageID.2263), Defendants do not provide an adequate explanation why Plaintiffs, whose student leaders hold significant religious responsibilities and lead services on campus, (ECF No. 47-48, PageID.2299, 2301; ECF No. 59, PageID.2714-16, 2719-20), should not also be permitted to select their own leaders based on faith as a campus "minority." In all, the record demonstrates that Defendants' non-discrimination policy is inconsistent and

---

[6]     Requirements that leaders agree with an organization's principles proliferate in American life. They are regularly found, for example, at major corporations, labor unions, and government. *See*, *e.g.*, Code of Conduct, General Motors 8, 22 (2019) (in employee Code of Conduct stating commitment to many principles, including "environmental stewardship . . . [and] reduc[ing] our carbon footprint," and clarifying that the Code "applies to everyone in our company"); Constitution of the United Automobile, Aerospace and Agriculture Implement Workers of America 7, 23 (2018) (requiring leaders be a member in good standing, who must "not [be] affiliated with any organization whose principles and philosophy are contrary to those of this International Union as outlined in the Preamble of this Constitution"); *Oath of Office*, The United States Senate, https://www.senate.gov/artandhistory/history/common/briefing/Oath_Office.htm (last visited Mar. 30, 2021) ("I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same.").

riddled with exceptions. As the Sixth Circuit stated in *Kincaid*, the decision to delist Plaintiffs "was a rash, arbitrary act, wholly out of proportion" to purposes of a free, open, and diverse RSO program. 236 F.3d at 356.

In *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, the Detroit public transportation system ("SMART") ran a program for placing advertisements on buses and bus shelters. 978 F.3d 481, 486 (6th Cir. 2020). SMART barred ads that were "political" and engaged in "scorn or ridicule." *Id*. It permitted ads that sought to "get out the vote"; that asked individuals to report drunk drivers; and that advertised free birth control. *Id*. at 486. Further, SMART allowed an ad that asked "Don't believe in God? You are not alone." *Id*. at 487. When a religious group submitted an ad asking "Hurting after an abortion?," displaying an illustration of Jesus, and providing a confidential help line, SMART refused to place the ad for being "political." *Id*. at 487-88. An ad by an unrelated group asked "Leaving Islam?" and listed a website "RefugeFromIslam.com." *Id*. at 488. That ad was also deemed political and was denied placement on SMART buses and bus stops. *Id.*

The Sixth Circuit reviewed SMART's ad program as a limited public forum. *Id*. at 491-93. The court recounted the numerous inconsistent applications of the anti-"political" policy. SMART permitted "public-issue ads" such as "get-out-the-vote drives or public-service announcements encouraging individuals to report drunk drivers." *Id*. at 494-95. SMART stated it looked at the abortion ad's website and determined it included "pro-life information," but a SMART official stated that SMART did not look at the website for the "Don't believe in God?" ad, which featured a presentation that was noticeably secularist. *Id*. at 495. A SMART official attempted to explain the policy as

applying to topics that "society is fractured on." *Id.* at 496. Yet the court pointed out that

the "Don't believe in God?" ad could reasonably be, and was, interpreted as "promoting

the view that God does not exist," and the existence of God was an issue that "factions

of society [are] fractured on." *Id.* The court also noted that SMART had permitted an ad

"promoting free birth control," a product "some members of our society do not approve

of." *Id.* The Sixth Circuit concluded that SMART had not created an "objective, workable

standard" and that SMART had engaged in "subjective enforcement of an indeterminate

prohibition." *Id.* at 497 (quoting *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891

(2018)).

　　　The same issues that confronted SMART's unconstitutional ad policy in

*American Freedom Defense Initiative* are also present here. Defendants' non-

discrimination policy is riven with exceptions and "overlooked" non-enforcement.

Numerous student groups that discriminated based on belief were permitted to hold

RSO status. (ECF No. 59, PageID.2755-59.) "Reunite and Organize in Spite of

Everything" required that its members "share with us the goal of African unification." (*Id.*,

PageID.2755-56.) The Macedonian-American Student Association mandated that all its

members "agree with the goals of the group," including "bring[ing] Macedonian-

American students together in order to preserve and enrich [the] ethnicity." (*Id.*,

PageID.2757-58.) The Secular Student Alliance "promote[d] secular values" and

required that leaders "have shown commitment to the group." (*Id.*, PageID.2757.) The

group's leaders and members were not permitted to "preach." (*Id.*) The Young

Americans for Freedom mandated that members agree with the group's "principles."

(*Id.*, PageID.2759.) To become a member of the International Youth and Students for

Social Equality, individuals were required to be "in full agreement with the [group's] statement of principles." (*Id.*)

In fact, many religious RSOs limited leadership to believers. (*Id.*, PageID.2750-52.) For example, to become a leader for the Newman Catholic Center, individuals were required to be "faithful." (ECF No. 59, PageID.2750.) Leaders were also obliged to engage in "prayerful Discernment." (*Id.*) The Muslim Student Association would remove individuals from leadership positions if they "[v]iolat[ed] an Islamic principle that deems him/her unworthy to serve as a Muslim leader on campus." (*Id.*, PageID.2751.) Virtuous 31's leaders were required to "really love God." (*Id.*, PageID.2751-52.)

Several student groups openly violated other protected categories of the non-discrimination policy without repercussion. (*Id.*, PageID.2738-47.) For instance, club sports teams, fraternities, and sororities discriminated in membership and leadership selection on the basis of sex and gender identity. (*Id.*, PageID.2738-43.) The Iraqi Student Association limited leadership to "dedicated Iraqi student[s]," and the Student Veterans Organization discriminated in membership and leadership selection based on veteran status. (*Id.*, PageID.2744-45, 2747.)

Defendants have not established an "objective [and] workable standard," and, like the government in *American Freedom Defense Initiative*, Defendants have created an inconsistent system that cannot be adequately explained or rationalized. 978 F.3d at 497.

Furthermore, Defendants' exception for "minority" groups presents the same kind of definitional difficulties as the ban on "political" ads in *American Freedom Defense Initiative*. The dictionary definition of "minority" is broad and is not limited to a specific

belief or identity. It includes "[a] group or subdivision whose views or actions distinguish it from the main body of people" and "the smaller number or part." *Minority*, *Oxford English Dictionary* (2020). Defendants have not established a written policy for what constitutes a minority; it appears that groups like the Student Veterans Organization would qualify. (ECF No. 47-33, PageID.1975-76; ECF No. 55, PageID.2552-53.) Defendants provide no objective explanation why small veterans' groups should be permitted to discriminate in selecting persons for leadership roles, but Plaintiffs as a small religious group cannot. The school's interpretation and application of the non-discrimination policy amounts to a "subjective enforcement of an indeterminate prohibition." *American Freedom Defense Initiative*, 978 F.3d at 497.

Similarly, in *United Food and Commercial Workers Union v. Southwest Ohio Regional Transit*, a public bus service in Cincinnati ("SORTA") allowed for advertisements on its busses and shelters, but prohibited advertisements touching on "controversial public issues that may adversely affect SORTA's ability to attract and maintain ridership." 163 F.3d at 346. Ads were also required to "be aesthetically pleasing and enhance the environment for SORTA's riders and customers and SORTA's standing in the community." *Id.* SORTA accepted advertisements containing pro-union messages such as "Please Shop Union Grocery Stores," "Shop Union," "Union Shop," "UFCW Local 1099," "We Care About You," "Organize Today!!!," and "Union Yes!!!" *Id.* at 346. However, SORTA denied placement of an ad that had similar pro-union messages and contained a photograph of union members participating in a recent protest. *Id.* at 347. SORTA explained that the ad was not aesthetically pleasing and contained intimidating content that could undermine SORTA's relationship with its

customers. *Id.* at 355. A district court issued a preliminary injunction barring SORTA from denying placement of the ad. *Id.* at 347.

The Sixth Circuit reviewed whether SORTA's actions were reasonable and viewpoint neutral. *Id.* at 355. The court recognized that SORTA's stated purpose for the forum was for "the provision of safe, efficient, and profitable Metro bus services." *Id.* at 354. Despite SORTA officials using their professional judgment to determine that the union ad was intimidating and could create an unwelcoming environment for riders, the court reviewed the record and determined that the proposed ad did not "actually interfere with the forum's stated purposes." *Id.* at 358. The court noted that SORTA had previously run pro-union ads; SORTA did not provide an adequate explanation for why the ad at issue was more controversial or intimidating. *Id.* Finally, SORTA claimed the ad was aesthetically not pleasing, but the Sixth Circuit affirmed the injunction, explaining that such conclusions were mere personal opinions and not based on objective standards. *Id.*

Here, the uncontested record shows that Defendants have applied a policy that lacks objectivity and is enforced on an inconsistent basis. *See id.* Religious groups limited their leadership (usually) based on profession of religion, secular groups limited their leadership (usually) to those who profess agreement with the groups' beliefs and missions, sports clubs and fraternities explicitly discriminated based on sex, and ethnic groups explicitly discriminated based on ethnicity. (ECF No. 59, PageID.2738-47, 2750-52, 55-59.) Many of these groups appear to have been in violation of the non-discrimination policy and many appear to have represented "minorities and women." (ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2724.)

Yet it was Plaintiffs, this small group of Christians, who were denied RSO benefits because they require their Christian leaders to be . . . Christian.

Defendants fail to provide reasonable and objective justifications for its application of the non-discrimination policy against Plaintiffs. *See United Food & Commercial Workers Union*, 163 F.3d at 358. Furthermore, as described above, preventing Plaintiffs from selecting their own religious leaders conditioned on religious standards of their choosing, does not "actually interfere with the forum's stated purposes" of facilitating community involvement on the part of students and encouraging a diverse and welcoming school. *Id.*, 163 F.3d at 358.

Defendants rely heavily on *Christian Legal Soc. v. Martinez*, but that case is readily distinguishable. 561 U.S. 661. In *Martinez*, a student group at University of California Hastings College of Law was denied access to school facilities as a registered student group for violating the school's non-discrimination policy. *Id.* at 673. Specifically, the group required all of its members to believe in the group's Christian religious convictions and excluded any student "who engages in unrepentant homosexual conduct." *Id.* at 672. The court noted the broad and expansive nature of the school's non-discrimination policy. All student groups were required to accept "any student" into the group, "regardless of [his or her] status or belief." *Id.* at 675. The school prohibited a group supporting the Democratic Party from excluding members who hold Republican political beliefs. *Id.* The court held that this true all-comers policy was reasonable in light of the purpose of the forum. *Id.* at 687-90.

Unlike the generally applicable all-comers policy in *Martinez*, Defendants in this case applied an inconsistent and arbitrary non-discrimination policy, which was riddled

with exceptions. Defendants permitted secular groups, including political organizations, to limit leadership overtly on a host of categories, identities, and beliefs. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59; ECF No. 47-33, PageID.1970.) The parties accept that RSOs were categorically permitted to discriminate in leadership selection on the basis of ethnicity, political viewpoint, ideology, physical attractiveness, and grade point average. (*Id.*, PageID.2759.) Defendants did not have an objective and consistent basis for its decision to revoke Plaintiffs' RSO status, and, unlike the policy in *Martinez*, Defendants' actions were not neutral and were not reasonable. *See Kincaid*, 236 F.3d at 355-56; *American Freedom Defense Initiative*, 978 F.3d 494-97; *United Food and Commercial Workers Union*, 163 F.3d at 358.

Furthermore, unlike the group in *Martinez*, Plaintiffs did not exclude all students who were homosexual or held different religious beliefs from involvement with the group. In fact, there is no dispute that Plaintiffs were welcoming of individuals with different backgrounds and beliefs and did not exclude membership based on protected characteristics. (ECF No. 59, PageID.2713.) Instead, Plaintiffs, as a religious group, have limited their leaders, who, it is not disputed, engage in deeply religious activities and minister on campus, to those who believe in the Christian religion. (ECF No. 47-48, PageID.2299, 2301; ECF No. 59, PageID.2714-16, 2719-20.) Preventing groups such as Plaintiffs from selecting leaders who are in ideological agreement with the organization they propose to lead can undermine vital interests of maintaining the group's character and expressing its beliefs in a coherent and authentic way. It is striking that so many RSOs at Wayne State limit leadership based on agreement with the groups' missions. (*See* ECF No. 59, PageID.2750-52, 55-59.) And such

requirements of leadership agreement are especially important for religious groups, who have substantial First Amendment protections. *See Hosanna-Tabor*, 565 U.S. at 184. They hold profound and sometimes deeply contested worldviews. If Plaintiffs were forced to accept faithless, non-Christians as faith leaders, which appears to be the aim of the enforcement of Defendants' policy, it is indisputable that the nature of Plaintiffs' religious group would fundamentally change. (ECF No. 47, PageID.1135; ECF No. 47-46, PageID.2224; ECF No. 47-48, PageID.2306-07.) With Plaintiffs' RSO status revoked, the Wayne State student body would have less ready access to diverse backgrounds and beliefs. As a matter of law, Defendants' violated Plaintiffs' right to free expression. Fed. R. Civ. P. 56(a).

## ii. Viewpoint Neutrality

Defendants' decision to revoke Plaintiffs' RSO status was also not viewpoint neutral, and, for this additional reason, the application of Wayne State's non-discrimination policy does not survive First Amendment scrutiny. *Rosenberger*, 515 U.S. at 829-30.

Defendants have applied the non-discrimination policy and prevented Plaintiffs from receiving RSO benefits because students who do not share Plaintiffs' religious beliefs will not be eligible for a Christian leader position. (ECF No. 59, PageID.2729; ECF No. 47-48, PageID.2304; ECF No. 47-42, PageID.2090.) But the record includes numerous examples of other student groups being permitted to register as official student groups despite the practice of limiting not just leadership, but even membership based on agreement with the principles of the group.

Defendants' policy on its face exhibits inconsistencies. It does not prohibit RSOs from discriminating on the basis of ethnicity, secular ideology, or political partisanship but bars RSOs from discriminating on the basis of religion. (ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2722-23.) The text of the policy also provides exceptions for "minority" groups, (ECF No. 47-38, PageID.2072; ECF No. 59, PageID.2724), but no definition of "minority" is known to exist, and Defendants keep no list of groups that, in their view, quality. (ECF No. 47-33, PageID.1975-76.) Plaintiffs have 20 to 35 members on Wayne State's campus, (ECF No. 47-47, PageID.2263), and the university enrolls over 20,000 students. *See Wayne State at a Glance*, Wayne State University, https://oira.wayne.edu/institutional-data/enrollment-headcount (last visited Mar. 30, 2021). At 0.15% of the whole, Plaintiffs are certainly a very small "minority"—a lesser part—of the student body.

The policy was no better in application. Members and leaders of "Reunite and Organize in Spite of Everything" were obligated to "share with [the RSO] the goal of African unification." (*Id.*, PageID.2755-56.) The Macedonian-American Student Association mandated that all members and leaders "agree with the goals of the group." (*Id.*, PageID.2757-58.) The Secular Student Alliance sought "[t]o promote secular values" and required that leaders "have shown commitment to the group"; leaders and members were barred from "preaching." (*Id.*, PageID.2757.) The Young Americans for Freedom mandated that members and leaders agree with the group's "principles." (*Id.*, PageID.2759.) To become a member of the International Youth and Students for Social Equality, students were obligated to be "in full agreement with the [group's] statement of principles." (*Id.*) All of these groups had secular missions and identities, and Defendants

admit that their behavior fell outside the bounds of the non-discrimination policy. (*See also* ECF No. 47-33, PageID.1970 ("Could the college [Democrats] limit membership or leadership based on political affiliation?" and "[c]ould PETA . . . limit membership or leadership based on commitment to the ethical treatment of animals?" Defendant Villarosa: "yes.").) It is also an established fact that RSOs were permitted to exclude students from membership and leadership roles based on students' sexual attractiveness and grade point average. (ECF No. 59, PageID.2759.)

Even for groups that appear to be covered by the non-discrimination policy, Defendants have intentionally created exceptions and allowed them to select members and leaders based on protected categories. Club sports teams, sororities, and fraternities were permitted to exclude members who did not fall within the groups' sex or gender identity category. (ECF No. 59, PageID.2738-39, 2740-43.) Defendants state explicitly that club sports teams, fraternities, and sororities were "exempt" from the non-discrimination policy, although no such exception is found in the language of the policy. (*Id.*, PageID.2740-41.) Further, the Iraqi Student Organization required that its leaders be "dedicated Iraqi student[s]," (*id.*, PageID.2744-45), and the Student Veterans Organization limited membership and leadership positions to those who are veterans, veteran's dependents, and Reserve Officers' Training Corps ("ROTC") members. (*Id.*, PageID.2747.) Even other religious groups, such as the Newman Catholic Center and the Muslim Student Association were permitted to select leaders based on religious belief and still retain RSO status. (*Id.*, PageID.2750-51.) Nonetheless, Defendants maintain that imposing religious criteria for leadership selection violates Wayne State's non-discrimination policy and that Plaintiffs are in violation for requiring that their leaders

be Christian. (*Id.*, PageID.2748 ("[L]eadership criteria . . . violates the Non-Discrimination Policy by imposing religious criteria.").)

Defendants cannot limit access to public forums for "certain points of view," while permitting others to engage in the same expressive activity to offer different views. *Am. Freedom Def. Initiative*, 978 F.3d at 498. Yet, as demonstrated by the facial reading of Defendants' non-discrimination policy and in the policy's application, Defendants have barred Plaintiffs from selecting leaders that share its Christian views while allowing other groups to engage in similar form of leadership selection. This divergent treatment cannot withstand constitutional scrutiny.

The Supreme Court has, through many years and numerous opinions, shown a readiness to strike down public school policies that treat religious groups differently from secular groups engaging in similar activity.

In *Widmar v. Vincent*, a university barred a religious group from accessing school resources as a registered student organization. 454 U.S. 263, 265 (1981). School policy disallowed use of school facilities "for purposes of religious worship or religious teaching." *Id.* The court held that the school's exclusion of the religious group was unconstitutional and constituted "discriminat[ion] against student groups and speakers based on their desire . . . to engage in religious worship and discussion." *Id.* at 269. The Court recognized the ability of universities to enact reasonable and content-neutral regulations on speech in such settings. *Id.* at 276-77.

In *Lamb's Chapel v. Center Moriches Union Free School District*, a local school district denied a religious group access to school facilities to show a film series advocating a "return[] to traditional, Christian family values" in family teachings. 508

U.S. 384, 388 (1993). The school explained that the film was "church related." *Id.* at 389. The Court noted that the school had not placed the subject of child rearing and family values outside the limits of the public forum. "There was no suggestion . . . that a lecture or film about child rearing and family values" would have been denied if it did not come "from a religious perspective." *Id.* at 393. The Court rejected the suggestion that the school's decision "was viewpoint neutral because it had been, and would be, applied in the same way to all uses of school property for religious purposes." *Id.* The school's action was held to be in violation of the First Amendment. *Id.* at 396-97.

In *Rosenberger v. Rectors and Visitors of University of Virginia*, a university created a reimbursement program for student news groups. 515 U.S. at 824. A student group sought reimbursement for a publication on community news through "a Christian perspective," but the university denied the request because publication involved "religious activity." *Id.* at 826-27. The school provided reimbursement to similar publications from groups with various political "positions or ideological viewpoints." *Id.* at 825. The Court rejected the university's position that it did not discriminate against the group based on its viewpoint. The university did not exclude secular groups from discussing the same topics, including religion, and it "select[ed] for disfavored treatment . . . religious editorial viewpoints." *Id.* at 831. The Court noted the special dangers of First Amendment violations in the university context. Universities, through a "tradition of thought and experience," are "at the center of our intellectual and philosophic tradition." *Id.* at 835. "For [u]niversit[ies] . . .  to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life." *Id.* at 836.

In *Good News Club v. Milford Central School*, a middle school denied access to a religious group that sought to use school facilities to host its meetings. 533 U.S. at 103-04. The Court rejected the contention that the group's teachings of "moral and character development to children" could be excluded from public school facilities because they contained an "additional layer" of religious messaging. *Id.* at 108-11. Secular groups were permitted to engage in the relevant activity, and the Court held it would be unconstitutional to prevent a group from undertaking the same activity simply because religion was involved. *Id.*

Even if Defendants in this case prevented all RSOs from limiting leadership roles based on religious belief, Defendants cannot constitutionally permit secular groups to discriminate and limit leadership positions based on secular categories, such as ideology, purpose, political identification, sex, and ethnicity, while preventing religious groups from engaging in activity that is the same except for its focus on religion. If Defendants permit secular student groups to limit whom their leaders may be in order to protect a shared and foundational identity, they must allow Plaintiffs to do so as well, even if it is based on religion. Public schools cannot create whole categories of divergent treatment for "religion," and Plaintiffs' choice in selecting its spiritual leaders is undeniably a substantial and profound aspect of its religious expression. *See Lamb's Chapel*, 508 U.S. at 396-97; *Rosenberger*, 515 U.S. at 831; *Good News Club*, 533 U.S. at 108-11. (ECF No. 47, PageID.1135; ECF No. 47-46, PageID.2224; ECF No. 47-48, PageID.2306-07.) Universities are centers for "thought and experience." *Rosenberger*, 515 U.S. at 835. Wayne State cannot hinder Plaintiffs' free expression, and their access to the significant benefits of the university forum, by barring limitations on religious

leadership while not demanding the same openness for secular leadership. As a matter

of law, Defendants violated Plaintiffs' rights to free expression.[7] Fed. R. Civ. P. 56(a).

## 2. Freedom of Association

The Supreme Court in *Martinez* held that when a university violates a student

group's free speech rights by improperly infringing on the group's membership

selection, the university has also violated the group's free association rights. 561 U.S. at

683. If the university fails constitutional security under forum analysis, its actions cannot

be constitutional under the right to expressive association. *Id.*

The Supreme Court's reasoning is well supported in the facts of this case.

Uncontradicted evidence shows that the revocation of Plaintiffs' RSO status burdened

its operations. (ECF No. 59, PageID.2719-20, 2138-39, 2764-67; ECF No. 47-45,

PageID.2138-39.) Plaintiffs could have avoided these negative results if only they would

allow non-believers to become Christian leaders, but the record shows without real

dispute that permitting that to happen would have changed the religious and expressive

nature of the organization. (ECF No. 47, PageID.1135; ECF No. 47-46, PageID.2224;

ECF No. 47-48, PageID.2306-07.) As explained above, Defendants' policy was not

neutrally applied, and many other student groups were permitted to limit leadership to

---

[7]     Plaintiffs assert that if Defendants' actions are not reasonable or are not
viewpoint neutral, Defendants must satisfy strict scrutiny. (ECF No. 47, PageID.1136,
1141.) Strict scrutiny is an exceptionally high burden. The government must show its
actions "serve a compelling state interest and the exclusion is narrowly drawn to
achieve that interest." *Miller*, 622 F.3d at 534. Defendants make no attempt to meet this
standard, and instead focus their arguments on whether their non-discrimination policy
was reasonable and viewpoint neutral. (ECF No. 53, PageID.2415-26.) Even if this
issue were contested, Defendants' arbitrary and inconsistent approach to leadership
discrimination would not withstand strict scrutiny.

those who support the groups' missions. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59.)

It is well established that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Miller*, 622 F.3d at 537; *see also Roberts*, 468 U.S. at 622 ("Freedom of association therefore plainly presupposes a freedom not to associate."). Further, courts defer "to an association's view of what would impair its expression." *Dale*, 530 U.S. at 653.

A reasonable jury could come to only one conclusion: Defendants actions infringed on Plaintiffs' rights to expressive association, *Martinez*, 561 U.S. at 683, *Miller*, 622 F.3d at 537, *Dale*, 530 U.S. at 653, and summary judgment will thus be granted in favor of Plaintiffs. *Anderson*, 477 U.S. at 248; Fed. R. Civ. P. 56(a).

### C. Freedom of Assembly Rights (Count 9)

The parties seek summary judgment on Plaintiffs' claim under freedom of assembly rights. The First Amendment states that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble." U.S. Const. amend I. Defendants accurately state that "courts have rarely defined the precise contours of the right to assemble." (ECF No. 53, PageID.2428.) In fact, Defendants assert that the analysis of the right to assemble will correspond to the analysis of Plaintiffs' rights to speak and associate; in Defendants' view, the claim "adds nothing to Plaintiffs' case." (*Id.*, PageID.2429.)

The Supreme Court has tied the freedom of assembly to the broad right of expressive association. "[T]he Court has recognized a right to associate for the purpose

of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (quoting *Roberts*, 468 U.S. at 618); *see also Healy*, 408 U.S. at 181 ("While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition."). Freedom of assembly has also been referenced in the context of forum analyses. *See Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) ("[G]overnment regulation of the speech, assembly, or association activities of members of a public speaker's audience, when triggered by fears of hostile listener response to the content of that speech, is not content neutral."); *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 452 (6th Cir. 2004) (quotations removed) ("[P]ublic streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum.").

The close nexus between First Amendment rights is justified. Gatherings for expressive activity implicate rights to assemble, speak, and associate. In order to effectively express a message or associate with others, individuals must in some way assemble. This fact was not lost on the founding generation. *See*, *e.g.*, *Continental Congress, 1774-1781*, Department of State Office of the Historian, https://history.state.gov/milestones/1776-1783/continental-congress (last visited Mar. 30, 2021) ("The Continental Congress was the governing body by which the American colonial governments coordinated their resistance to British rule during the first two years of the American Revolution."); *Documents from the Continental Congress and the Constitutional Convention, 1774 to 1789*, Library of Congress,

https://www.loc.gov/collections/continental-congress-and-constitutional-convention-from-1774-to-1789/ (last visited Mar. 30, 2021) (After the passage of the Stamp Act in 1764, "American colonists responded . . . with organized protests.").

Furthermore, the Supreme Court's *Martinez* decision demonstrated that distinctions between intertwined First Amendment rights are not always material or necessary. 561 U.S. at 683. Even though free speech and expressive association rights are well-developed and unique, the Court in *Martinez* declined to analyze them separately. *Id.* The Court reasoned that, in the student group registration context, separate First Amendment analyses would produce the same results. *Id.*

Here, the court will adopt *Martinez*'s logic and analyze Plaintiffs' freedom of assembly claim in conjunction with their freedom of speech and association claims. Defendants created a limited public forum to allow student groups such as Plaintiffs to gather and engage in expressive activity. (ECF No. 45-8, PageID.849; ECF No. 59, PageID.2716-17.) Defendants revoked these rights under the auspices of a non-discrimination policy. (ECF No. 59, PageID.2729; ECF No. 47-48, PageID.2304; ECF No. 47-42, PageID.2090.) As the court explained previously, the policy was not applied in a reasonable and consistent manner, and it did not serve to advance the purposes of the RSO program. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59.) Plaintiffs were forced to choose between the substantial benefits of RSO status, (ECF No. 59, PageID.2719-20, 2138-39, 2764-67; ECF No. 47-45, PageID.2138-39), and the right to select religious leaders who agree with their deeply held religious beliefs. (ECF No. 59, PageID.2713-15; ECF No. 47, PageID.1135; ECF No. 47-46, PageID.2224; ECF No. 47-48, PageID.2306-07, 2310, 2312.) Defendants thereby interfered with Plaintiffs'

60

ability to assemble as a campus ministry, along with their opportunities to speak and associate.

Just as Defendants violated Plaintiffs' freedom of speech and freedom of association by regulating Plaintiffs' expressions and limiting Plaintiffs' access to the public forum, Defendants also violated Plaintiffs' rights to assembly. *See Stanglin*, 490 U.S. at 24; *Grider*, 180 F.3d at 749; *Martinez*, 561 U.S. at 683. Summary judgment in favor of Plaintiffs is warranted. Fed. R. Civ. P. 56(a).

### D.  Free Exercise Rights (Counts 3 and 4)

Like Plaintiffs' freedom of internal management, speech, association, and assembly claims, Plaintiffs are entitled to summary judgment on their claims under the Free Exercise Clause of the First Amendment. The First Amendment prohibits laws that improperly burden the "free exercise" of free religion. U.S. Const. amend I.

"Free exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 256 (6th Cir. 2015). For instance, in *Rosenberger*, as in other Supreme Court cases that reviewed a public school's differential treatment of a religious group, the Court focused its discussion on forum analysis, despite the presence of free speech and free exercise issues and claims. 515 U.S. at 827 ("[Plaintiffs allege that the university] violated their rights to freedom of speech and press, to the free exercise of religion, and to equal protection of the law."); *see also Lamb's Chapel*, 508 U.S. at 396-97; *Good News Club*, 533 U.S. at 108-11.

This approach is appropriate in this case. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general

applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 879 (1990). However, courts have repeatedly stuck down government rules or policies that treat religious activities differently than secular activities, despite the activities having similar effects on the public interest the government policy is purportedly serving to protect. Such policies are not generally applicable.

For example, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, a government banned animal sacrifices, which had the effect of burdening the religious exercise of a small religious sect. 508 U.S. 520, 526-28 (1993). The Court noted that the government intended to advance two interests: "protecting the public health and preventing cruelty to animals." *Id.* at 543. Yet the government allowed primarily secular activities, such as the home consumption of hunted meat and the extermination of pests, that similarly threatened public health and involved similar examples of "animal cruelty." *Id.* at 543-46. The Supreme Court thus held that the law violated the Free Exercise Clause.

Similarly, in *Monclova Christian Academy v. Toledo-Lucas County Health Department*, the Sixth Circuit reviewed COVID-19 restrictions that closed all schools, religious and secular alike, but allowed other facilities, such as gyms and casinos, to remain open. 984 F.3d 477, 479 (6th Cir. 2020). The court noted that closing of school, even if religious ceremonies are allowed, burdened the ability of religious organizations to teach "faith [with] each day of in-person schooling."[8] *Id.* at 480. The court held that a

---

[8]     In doing so, the court cited the significant deference courts give to religious groups when identifying government actions that burden religious practice. *Id.* at 480 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724-25 (2014) (refusing to

law that "restricts religious conduct" must do so "the same way that analogous non-religious conduct is restricted." *Id.* (quotations removed). The government's actions were found to not be generally applicable because the "interests" of the government–slowing the spread of COVID-19–were not being used to justify restrictions of secular groups, like gyms, that were "comparable for purposes of spreading COVID-19." *Id.* at 480-82. The Sixth Circuit held that a finding of animus was not relevant to the inquiry; neutrality and equal application were at issue. *Id.* at 480; *see also Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (Without animus, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities.").

This analysis is very similar to limited public forum analysis and the court's determination that Defendants' restrictions were not reasonable in light of purpose of the forum. Like the government in *Church of the Lukumi Babalu Aye* and *Monclova Christian Academy*, Defendants prohibited Plaintiffs from limiting their leadership to those who believe in their mission. Although Defendants claimed to be advancing an interest of openness and attachment to Wayne State, they permitted a plethora of exclusions for other groups that similarly limited leadership selection based on sex, gender identity, political partisanship, ideology, creed, and ethnicity. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59.) Defendants were thus "prepared to impose upon [Plaintiffs]" substantial speech, association, and religious burdens "but not upon [secular groups and society]." *Church of the Lukumi Babalu Aye*, 508 U.S. at 545 (quoting

---

question organizations' beliefs that providing abortion-inducing drugs and devices burdened their religious practice)).

63

*Florida Star v. B.J.F.*, 491 U.S. 524, 542 (1989)). As confirmed by the court's free speech analysis, "an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy."[9] *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

The Free Exercise Clause prohibits "[a] government act that discriminates against a particular religion." *Prater v. City of Burnside*, 289 F.3d 417, 428 (6th Cir. 2002). The Supreme Court has repeatedly held that "disqualifying otherwise eligible recipients from a public benefit solely because of their religious character imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Espinoza v. Mont. Dept. of Rev.*, 140 S. Ct. 2246, 2255 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). This standard closely resembles viewpoint discrimination in limited public forum analysis. As the court held previously, Defendants' actions to bar Plaintiffs from being able to set leadership requirements for their religious leaders and hold RSO status, and intentionally creating carveouts for secular groups who also restrict leadership, was not viewpoint neutral and violated Plaintiffs' free speech rights. Defendants decision to revoke Plaintiffs' RSO status similarly infringed on Plaintiffs' free exercise rights. Summary judgment will be granted in favor of Plaintiffs. Fed. R. Civ. P. 56(a).

---

[9]     Defendants argue that they did not intentionally discriminate against Plaintiffs and thus did not violate the Free Exercise Clause. (ECF No. 53, PageID.2430.) Under Defendants' own understanding of the law, however, they assume that the policy is neutral and generally applicable, which it is not. Further, as described below and in the court's free speech analysis, Defendants intentionally created exceptions that removed numerous secular activities from the scope of the non-discrimination policy, while at the same time applying the policy against Plaintiffs on religion-based grounds. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59; ECF No. 47-33, PageID.1970.)

### E.  Free Exercise Rights under the Michigan Constitution (Count 15)

Plaintiffs bring free exercise claims under the Michigan Constitution. "The

Michigan Constitution also contains its own guarantee of religious freedom, . . . which is

at least as protective of religious liberty as the United States Constitution." *Winkler v.*

*Marist Fathers of Detroit, Inc.*, 500 Mich. 327, 901 N.W.2d 556, 573 n.4 (2017) (quoting

*People v. DeJonge*, 442 Mich. 266, 501 N.W.2d 127, 131 n.9 (1993)); *see also* Mich.

Const. art. 1, § 4.

In fact, Michigan courts have interpreted the Michigan Constitution to provide

broader coverage than that of the United States constitution. "[Courts] apply the

compelling state interest test (strict scrutiny) to challenges under the free exercise

language in [Mich.] Const. art. 1, § 4, regardless of whether the statute at issue is

generally applicable and religion-neutral." *Campion v. Sec. of State*, 761 N.W.2d 747,

753 (Mich. Ct. App. 2008) (citing *Reid v. Kenowa Pub. Schs.*, 680 N.W.2d 62, 68-69

(2004)); *see also McCready v. Hoffius*, 459 Mich. 131, 586 N.W.2d 723, 729 (1998),

*vacated on other grounds*, 459 Mich. 1235, 593 N.W.2d 545 (Table) (1999) (separating

analysis on the First Amendment and the Michigan Constitution and reviewing a

generally applicable law under a "compelling state interest test"); *Country Mill Farms,*

*LLC v. City of East Lansing*, 280 F. Supp. 3d 1029, 1056 (W.D. Mich. 2017) ("Under

Michigan law, religious freedom claims brought under Article 1, Section 4 of the state

constitution are analyzed using the compelling state interest test."). Thus, Defendants'

actions would be subject to strict scrutiny even if they were neutral and generally

applicable, which they were not.

For the reasons stated in court's analysis on the Free Exercise Clause of the
United States Constitution, Plaintiffs' are entitled to summary judgment. Fed. R. Civ. P.
56(a).

### F.  The Establishment Clause (Count 5)

The parties move for summary judgment on Plaintiffs' Establishment Clause
claim. The Sixth Circuit has frequently reviewed Establishment Clause challenges under
a three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). *See
Chaudhuri v. Tennessee*, 130 F.3d 232, 236 (1997) (quotations removed) ("[T]he
*Lemon* test still appears to govern Establishment Clause cases."). That test requires
analysis of "whether government's actual purpose is to endorse or disapprove of
religion"; "whether the principal or primary effect of the challenged state action either
advances or inhibits religion"; and whether the government's action involves an
"excessive entanglement of church and state." *Id.* at 236-38.

Supreme Court Justices have created their own offshoots for establishment
clause analysis. Justice O'Connor used an "endorsement" analysis, where the court
reviewed whether the purpose and effect of a government action was to "endorse or
disapprove of religion"; "excessive entanglement" with religion remained a relevant
factor. *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'r*s., 788 F.3d 580, 587 (6th Cir.
2015) (citing *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)).
Justice Kennedy was often found considering whether government actions involved
"coercion." *See Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492
U.S. 573, 662 (1989) (Kennedy, J., concurring) ("Absent coercion, the risk of
infringement of religious liberty by passive or symbolic accommodation is minimal.");

*Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) ("Offense, however, does not equate to coercion."). Finally, several cases, most prominently in the context of public prayer and religious monuments, have looked toward history and considered whether a practice "was accepted by the Framers and has withstood the critical scrutiny of time and political change." *See Smith*, 788 F.3d at 587 (quoting *Town of Greece*, 572 U.S. at 577).

Significantly, in 2019 the Supreme Court cast doubt on *Lemon*'s use as a standard rule for the Establishment Clause. In *American Legion v. American Humanist Association*, the Court described the state of *Lemon* as follows:

> If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met. In many cases, this Court has either expressly declined to apply the test or has simply ignored it. . . . This pattern is a testament to the *Lemon* test's shortcomings. As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the *Lemon* test could not resolve them. . . . The test has been harshly criticized by Members of this Court, lamented by lower court judges, and questioned by a diverse roster of scholars.

139 S. Ct. 2067, 2080-81 (2019). Although the Court did not expressly discard *Lemon* for all Establishment Clause cases, it provided a powerful limitation of its value and significance.[10]

Whatever framework is used, the central principle of the Establishment Clause is government neutrality. *McCreary Cnty. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)) ("First Amendment mandates governmental neutrality between religion and religion, and between religion

---

[10]    The Sixth Circuit has not yet considered the impact of *American Legion* on Establishment Clause analysis.

and nonreligion."). While the government cannot establish an official government religion like the Church of England, it also cannot treat religious groups disfavorably, and in a way establish a church of secularism. *See Satawa v. Macomb Cnty. Road Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (quotations removed) ("[T]he government may neither officially promote religion, nor harbor an official purpose to disapprove of a particular religion or of religion in general."). As the Supreme Court described in the context of religious monuments, "a government that roams the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine will strike many as aggressively hostile to religion. Militantly secular regimes have carried out such projects in the past, and for those with a knowledge of history, the image of monuments being taken down will be evocative, disturbing, and divisive." *Am. Legion*, 139 S. Ct. at 2084-85.

As the court described in the context of free speech and free exercise, Defendants' actions to revoke Plaintiffs' RSO status were unreasonable, arbitrary, and lacked neutrality. It is undisputed that Defendants intentionally and explicitly crafted their non-discrimination policy to limit application to certain groups and categories while providing exceptions for others. Student groups were permitted to restrict leadership based on sex, gender identity, political partisanship, ideology, creed, ethnicity, and even GPA and physical attractiveness. (ECF No. 59, PageID.2738-47, 2750-52, 2755-59; ECF No. 47-33, PageID.1970.) All these categories are secular in nature. Defendants fail to explain how overt discrimination based on sex, politics, and looks allows for an open and attractive campus environment but religious discrimination, used for leadership roles with profound spiritual responsibilities, does not allow for such an

environment. Defendants' non-discrimination policy, both facially and as applied, does not exhibit neutrality toward religious and secular practices, both of which on Wayne State's campus require student leadership to conform with group missions, identities, and character. *McCreary Cnty.*, 545 U.S. at 860; *see also Rosenberger*, 515 U.S. at 845-46 (A university's decision to deny a religious group access to school resources "risk[ed] fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires."); *Good News Club*, 533 U.S. at 144 (holding that allowing religious groups access to school resources on equal footing "ensure[s] neutrality" under the Establishment Clause, and noting that "perceived . . . hostility toward . . . religious viewpoint[s] if [religious groups are] excluded from [a] public forum" would be relevant to Establishment Clause analysis).

Furthermore, based on the record presented to the court, Defendants' actions constituted an "excessive entanglement" with religion as a matter of law. *Chaudhuri*, 130 F.3d at 236; *Satawa*, 689 F.3d at 526 ("Failure under any of *Lemon*'s three prongs deems governmental action violative of the Establishment Clause."). As described in the court's internal management rights analysis, above, Defendants have interfered with Plaintiffs' selection of their spiritual advisor and leader. (ECF No. 47-48, PageID.2299, 2301; ECF No. 59, PageID.2714-16, 2719-20.) Such leaders are properly classified as ministers under the First Amendment. *See Our Lady of Guadalupe School*, 140 S. Ct. at 2064; *supra* Section III.A.2.ii. By interjecting themselves into how Plaintiffs may select their ministers, and what beliefs such ministers must hold, Defendants have involved themselves in controlling and monitoring matters of internal religious doctrine and practice. *See Hosanna-Tabor*, 565 U.S. at 185 (Under the Establishment Clause and

69

Free Exercise Clause, "it is impermissible for the government to contradict a church's determination of who can act as its ministers."); *Our Lady of Guadalupe School*, 140 S. Ct. at 2060 ("[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion."); *Smith*, 788 F.3d at 594 (quoting *Lemon*, 403 U.S. at 625) (reasoning that entanglement issues arise when a government policy, to be enforced, requires "comprehensive, discriminating, and continuing state surveillance" of religious activity). The Founders designed the First Amendment to prevent such intrusions, and Defendants violated the Establishment Clause. Summary judgment will be awarded in Plaintiffs' favor. Fed. R. Civ. P. 56(a).

### G.  Qualified Immunity

Plaintiffs name two Wayne State administrators in their individual capacities: Defendant Villarosa, Wayne State's Coordinator of Student Life, and Defendant Strauss, Wayne State's Dean of Students. (ECF No. 1, PageID.6.) These two Defendants move for summary judgment, arguing that they are entitled to qualified immunity for Plaintiffs' First Amendment claims. (ECF No. 45, PageID.763-66; ECF No. 58, PageID.2705-05.) They assert the constitutional rights at issue are not "clearly established." (ECF No. 45, PageID.763-66; ECF No. 58, PageID.2705-05.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Pearson v.*

*Callahan*, 555 U.S. 223, 242-43 (2009) (citation removed) ("[Q]ualified immunity is unavailable in a suit to enjoin future conduct.").

As described in the court's prior analysis, Defendants have violated Plaintiffs rights to internal religious management, free speech, freedom of association, freedom of assembly, and free exercise; Defendants also violated the Establishment Clause. Thus, Plaintiffs have satisfied the first element of qualified immunity. *al-Kidd*, 563 U.S. at 735.

"A right is clearly established when a reasonable officer would know—in the given situation and with the information known to him at the time—that his conduct violated that right." *Rieves v. Town of Smyrna,* 959 F.3d 678, 695 (6th Cir. 2020). Stated another way, "[i]f reasonable officials could disagree as to whether the conduct at issue was lawful, then qualified immunity applies." *Id.*  "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Colombia v. Wesby*, 138 S.Ct. 577, 590 (2018).

"[C]ourts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Thus, a court cannot simply cite the Fourth Amendment's prohibition on unreasonable searches and seizures, or the Due Process Clause generally, when applying it to unique factual circumstances where a reasonable government officer would not consider his or her actions constitutionally suspect. *See Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 742; *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). That being said, it is generally understood that the same or materially similar facts need not have arisen in prior cases

for a right to be clearly established. "[T]he precise factual scenario need not have been found unconstitutional." *Baynes*, 799 F.3d at 611; *accord Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). Plaintiffs are not required to show "fundamentally similar" or "materially similar facts." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes*, 799 F.3d at 612 (citing *Hope*, 536 U.S. at 742-44).

It is well established through numerous cases, both before the Sixth Circuit and Supreme Court, that once a government opens its facilities or benefits as a limited public forum, the government cannot restrict speech or expressive association with unreasonable rules and cannot discriminate on the basis of viewpoint. *See, e.g.*, *Kincaid*, 236 F.3d at 355-56; *American Freedom Defense Initiative*, 978 F.3d 494-97; *United Food and Commercial Workers Union*, 163 F.3d at 358; *Martinez*, 561 U.S. at 679; *Widmar*, 454 U.S. at 276-77; *Lamb's Chapel*, 508 U.S. at 396-97; *Rosenberger*, 515 U.S. at 831; *Good News Club*, 533 U.S. at 108-11. It is equally well established that this standard applies to public schools and public-school policies that restrict religious groups from accessing school facilities. *See Kincaid*, 236 F.3d at 355-56; *Martinez*, 561 U.S. at 679; *Widmar*, 454 U.S. at 276-77; *Lamb's Chapel*, 508 U.S. at 396-97; *Rosenberger*, 515 U.S. at 831; *Good News Club*, 533 U.S. at 108-11.

Similarly, the Sixth Circuit and Supreme Court have repeatedly held that government actions are not neutral and generally applicable for purposes of the Free Exercise Clause when they treat religious activities more harshly than similar secular activities. *See, e.g.*, *Church of the Lukumi*, 508 U.S. at 543-46; *Monclova Christian*

72

*Academy*, 984 F.3d at 479; *Roberts*, 958 F.3d at 413; *Ward*, 667 F.3d at 740; *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66-67 (2020). Disparate and discriminatory treatment of religious groups due to their religious character violates the Free Exercise Clause. *See, e.g.*, *Prater*, 289 F.3d at 428; *Espinoza*, 140 S. Ct. at 2255; *Trinity Lutheran*, 137 S. Ct. at 2021.

Finally, Establishment Clause jurisprudence clearly states that governments must treat religious and secular activities neutrally, and that government cannot become excessively entangled in religious functions and operations. *See, e.g.*, *McCreary Cnty.*, 545 U.S. at 860; *Satawa*, 689 F.3d at 526; *Am. Legion*, 139 S. Ct. at 2084-85; *Rosenberger*, 515 U.S. at 845-46; *Good News Club*, 533 U.S. at 144; *Smith*, 788 F.3d at 594.

Defendants violated Plaintiffs' First Amendment rights by revoking their RSO status, along with the substantial advantages of being an official group on campus, based on Plaintiffs' limiting their leaders to supporters of their beliefs, while also allowing numerous secular groups, and other religious groups, to engage in the same behavior without losing their RSO status. Greater specificity of Plaintiffs' constitutional rights is not required. *Baynes*, 799 F.3d at 611. Defendants Villarosa and Strauss are not entitled to qualified immunity because the rights violated were clearly established. *al-Kidd*, 563 U.S. at 735.

Defendants Villarosa and Strauss present no arguments in favor of qualified immunity with regard to Plaintiffs' claims under the Religion Clauses and Plaintiffs' rights

to internal management,[11] and the court finds that Defendants are not entitled to qualified immunity for these claims. Extensive historical support and the First Amendment's original understanding clearly establish that the government, whether it be the judicial, executive, or legislative, violate the Constitution when it interferes with a religious organization's choice in ministers. *See Hosanna-Tabor*, 565 U.S. 171, 177-85; *Our Lady of Guadalupe School*, 140 S. Ct. at 2060-62; *Conlon*, 777 F.3d at 837; *Beshear*, 981 F.3d at 510. It is insignificant that few cases have applied ministerial selection protections outside the employment context. As the court explained in its prior analysis, this relative paucity of caselaw lends greater support to the unconstitutionality of such actions; governments may not frequently tread in ways that obviously violate the Constitution. As the Sixth Circuit explained in *Guertin v. State*, "[t]he easiest cases don't even arise." 912 F.3d at 933 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). The court need not be presented with the "precise factual scenario," *Baynes*, 799 F.3d at 611, or "fundamentally similar" facts, *Hope*, 536 U.S. at 741, as prior caselaw. Defendants plainly interfered with Plaintiffs' choice in ministers, and qualified immunity is not justified on those counts. *al-Kidd*, 563 U.S. at 735.

Unlike the right to internal management, the right to assembly has not been explained or defined. The court is aware of no Sixth Circuit or Supreme Court case that has analyzed in depth the history, meaning, or contours of the right. Here, the court held that Plaintiffs' right to assembly runs concurrently with their rights to speak and

---

[11]     It is not the court's responsibility to "put flesh on [the] bones" of a party's argument. *McPherson v. Kelsey*, 125 F.3d 989, 996 (6th Cir. 1997) (quotation removed). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Id.*

associate. However, a reasonable government official in Defendants Villarosa and Strauss' positions could disagree. *Rieves,* 959 F.3d at 695. The unconstitutionality of Defendants' decision to revoke Plaintiffs' RSO status under Plaintiffs' right to assembly was not clearly established, and Defendants Villarosa and Strauss are entitled to qualified immunity. *Id.*

In all, Defendants are not entitled to qualified immunity for their infringements on Plaintiffs' internal management, free speech, free association, and free exercise. Defendants also have no qualified immunity for their violation of the Establishment Clause. However, Defendants are entitled to qualified immunity for Plaintiffs' freedom of assembly claim. Thus, Defendants' motion for summary judgment on this issue will be granted in part and denied in part.

### H. The Remainder of Plaintiffs' Claims: Free Speech Rights Under the Michigan Constitution (Counts 16-19), the Equal Protection Clause (Count 10), the Due Process Clause (Count 20), and the ELCRA (Count 13)

Defendants move for summary judgment on the rest of Plaintiffs' claims. (ECF No. 45, PageID.756-62.) The court will address each count in turn.

### 1. Free Speech Under the Michigan Constitution

Plaintiffs claim that Defendants violated the Michigan Constitution's guarantee of free speech and petition. *See* Mich. Const. art. I, §§ 3, 5. "The United States and Michigan Constitutions provide the same protections of the freedom of speech." *Thomas M. Cooley Law Sch. v. Doe 1*, 833 N.W.2d 331, 338 (Mich. Ct. App. 2013); *accord In re Contempt of Dudzinski*, 667 N.W.2d 68, 72 (Mich. Ct. App. 2003). Defendants violated the United States Constitution's free speech protections as a

matter of law. At a minimum, Plaintiffs have stated triable claims under the Michigan Constitution. Thus, Defendants' motion for summary judgment will be denied.

Plaintiffs did not move for summary judgment on these state counts. However, the court may grant summary judgment *sua sponte*. Fed. R. Civ. P. 56(f)(3). In order to do so, "the losing party must have had notice that the court was considering summary judgment on the claim, as well as a reasonable opportunity to present its arguments and evidence of the claim." *Aubin Indus., Inc. v. Smith*, 321 F. App'x 422, 423 (6th Cir. 2008). The court now provides Defendants notice that it is "considering summary judgment" in favor of Plaintiffs on the free speech claims under the Michigan Constitution. Fed. R. Civ. P. 56(f)(3). The court will order supplemental briefing on this issue. To conserve resources, the parties may submit a stipulation in lieu of briefing.

## 2. Equal Protection Clause

"State actions that treat individuals differently on the basis of a fundamental right trigger strict scrutiny." *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015) (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). The difference between asserting a fundamental right directly and bringing an equal protection clause claim can be small; the two claims are often analyzed in conjunction with one another. *See, e.g.*, *Obergefell v. Hod0ges*, 576 U.S. 644, 672-76 (2015) (analyzing the fundamental right to marry together with the Equal Protection Clause, noting that both concepts "may be instructive as to the meaning and reach of the other"). As a matter of law, Defendants infringed on Plaintiffs' fundamental rights to speech, association, and religious exercise by treating student groups differently. They applied an arbitrary and inconsistent policy that was not

neutral to Plaintiffs' religion or religious viewpoints. Defendants' motion for summary judgment on Plaintiffs' equal protection claim will be denied.

In addition, in light of the court's conclusions that Defendants violated Plaintiffs' First Amendment rights, the court will *sua sponte* consider summary judgment in favor of Plaintiffs on the equal protection claim. *See* Fed. R. Civ. P. 56(f)(3); *Aubin Indus., Inc.*, 321 F. App'x at 423. The court will order supplemental briefing on the issue. As an alternative to briefing, the parties may file a stipulation.

## 3. Due Process Clause

To bring a procedural due process claim, Plaintiffs must show "(1) [they] had a life, liberty, or property interest protected by the Due Process Clause; (2) [they were] deprived of this protected interest; and (3) the state did not afford [them] adequate procedural rights prior to depriving [them] of the . . . interest." *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Defendants focus their arguments on the second element, asserting that they did not violate Plaintiffs' liberty interest. "A liberty interest may arise from the Constitution itself." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In fact, courts have applied the Bill of Rights to the states, including the First Amendment, using the Fourteenth Amendment's guarantee that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV; *see McDonald v. City of Chicago*, 561 U.S. 742, 754-769 (2010) (describing the history of incorporation). The standard is identical to the one used in procedural due process analysis. As described above, Defendants violated Plaintiffs' First Amendment rights, including freedoms of speech, association, and exercise. Plaintiffs have, at a

minimum, presented a triable claim under the Due Process Clause. *See* Fed. R. Civ. P. 56(a). Defendants' motion for summary judgment on this claim will be denied.

Plaintiffs did not move for summary judgment on this count, and neither party presents detailed arguments on the third element of a procedural due process claim, whether Defendants "afford[ed] [Plaintiffs] adequate procedural rights prior to depriving [them]" of their liberty interests. *Women's Med. Pro. Corp.*, 438 F.3d at 611. Thus, the court will not *sua sponte* consider summary judgment in favor Plaintiffs.

## 4.  ELCRA

Michigan's ELCRA prohibits educational institutions from "[d]iscriminat[ing] against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." Mich. Comp. Laws § 37.2402(a). The law also prohibits "[r]etaliation or discriminat[ion] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.2701(a). "To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an . . . action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse . . . action. *Garg v. Macomb Cnty. Comm. Mental Health Servs.*, 472 Mich. 263, 696 N.W.2d 646, 653 (2005) (quoting *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 663 (Mich. Ct. App. 1997)).

The basis of Plaintiffs' ELCRA claim is that their chapter president complained to Defendants after Defendant Villarosa contacted Plaintiffs on October 3, 2017, to inform Plaintiffs that they were in violation of Wayne State's non-discrimination policy. (ECF No. 1, PageID.36; ECF No. 55, PageID.2578.) Defendants' sole basis for summary judgment on this count is that no adverse actions happened after the chapter president's complaint was made. According to Defendants, the "timeline . . . renders [Plaintiffs'] theory plainly implausible." (ECF No. 45, PageID.762.) However, Plaintiffs' chapter president provided testimony that she talked to Defendant Villarosa and pointed out that "other groups on campus ask their members or leaders to share their views" and "other groups on campus . . . seem to violate the non-discrimination policy." (ECF No. 59, PageID.2729-30; ECF No. 47-48, PageID.2304.) The chapter president then sent an email on October 17, 2017, that asked Defendant Villarosa explicitly "why you are applying the non-discrimination policy in this way particularly as it seems to be a violation of our first amendment rights of religious expression (our religious beliefs require these leadership requirements)." (ECF No. 47-48, PageID.2320.) Only after these communications did Defendants officially revoke Plaintiffs' RSO benefits. (ECF No. 59, PageID.2732-33; ECF No. 47-22, PageID.1367-68.) Defendants sent Plaintiffs a message stating that "your organization is no longer registered with the Dean of Students Office," and Defendants cancelled all of Plaintiffs' pending meetings. (ECF No. 59, PageID.2732-33; ECF No. 47-22, PageID.1367-68.)

79

Defendants have not shown that, as a matter of law, all adverse actions took place only prior to the chapter president's complaints. Defendant's motion for summary judgment on the ELCRA claim will be denied.[12] Fed. R. Civ. P. 56(a).

## I.   Remedy

Plaintiffs ask that the court award nominal damages, issue a permanent injunction, and set a trial for damages. The court will do all three.

"Nominal damages are a symbolic recognition of harm that may be awarded without proof of actual harm and 'have only declaratory effect.'" *Pagan v. Vill. of Glendale*, 559 F.3d 477, 478 n.1 (6th Cir. 2009) (quoting *Morrison v. Bd. of Educ.*, 521 F.3d 602, 610 (6th Cir. 2008)). Nominal damages "follow from the fact of a constitutional violation," and the court may award nominal damages after granting summary judgment in favor of Plaintiffs. *Id.*; *see also Glowacki v. Howell Pub. Sch. Dist.*, 566 F. App'x 451, 453, 456 (6th Cir. 2014) (affirming a district court decision to award nominal damages, but not attorney fees, after granting a plaintiff's motion for summary judgment). Defendants violated Plaintiffs' constitutional rights, and Plaintiffs are entitled to at least nominal relief.[13] *See id.*; *Layman Lessons, Inc. v. City of Millersville, Tenn.*, 636 F. Supp. 2d 620, 653 (M.D. Tenn. 2008) (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)) ("Under clear Supreme Court precedent, constitutional violations may be actionable for nominal damages without proof of actual injury.").

---

[12]   Plaintiffs do not move for summary judgment on the claim, and the court will not *sua sponte* consider summary judgment in favor of Plaintiffs.
[13]   Defendants provide no argument that nominal damages are at this stage inappropriate if Plaintiffs are entitled to summary judgment.

"[T]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that for a preliminary injunction the plaintiff must show a likelihood of success on the merits rather than actual success." *Am. C.L. Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)). The obtain a permanent injunction, the plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 338, 390 (2006).

Once the court has determined that a First Amendment violation has occurred, the factors weigh heavily in favor of issuing an injunction. The success on the merits "will often be determinative," *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)), and the factors "essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dept. of Comm.*, 296 F.3d 477, 485 (6th Cir. 2002) (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226-27 (6th Cir. 1996)).

"With regard to the factor of irreparable injury, . . . it is well-settled that loss of First Amendment freedoms ... unquestionably constitutes irreparable injury." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682 (6th Cir. 2014) (quoting *Connection Distrib.*, 154 F.3d at 288)). Irreparable injury is closely tied to whether adequate remedies are

available at law. "[T]here are no available remedies at law that are adequate to compensate for a loss of First Amendment rights." *Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010). "Additionally, if the plaintiff shows a . . . challenged [policy] is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville*, 274 F.3d at 400. And "it is always in the public interest to prevent violation of a party's constitutional rights." *Id.* (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1075 (6th Cir. 1994).

Defendants have renewed Plaintiffs' RSO status for the pendency of this litigation but maintain that Plaintiffs' leadership criteria is in violation of the non-discrimination policy. (ECF No. 59, PageID.2774-75.) Defendants have not agreed to allow Plaintiffs to limit leadership on religious grounds after this litigation has concluded. Thus, injunctive relief is appropriate. No "competing constitutional rights" are implicated in this case, *Cnty. Sec. Agency*, 296 F.3d at 485, and all factors weigh in favor of an injunction. *eBay Inc.*, 547 U.S. at 390. The court will set this case for trial on the issue of compensatory damages.

## IV. CONCLUSION

The uncontested facts demonstrate that Defendants violated Plaintiffs' rights to internal management, free speech, freedom of association, freedom of assembly, and free exercise as a matter of law. Defendants also violated the Establishment Clause as a matter of law. Defendant Villarosa and Strauss are entitled to qualified immunity on only Plaintiffs' freedom of assembly claim. Qualified immunity is otherwise denied. Moreover, the remainder of Plaintiffs' claims survive Defendants' motion for summary judgment. Accordingly,

IT IS ORDERED that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 47) is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (ECF No. 45) is GRANTED IN PART and DENIED IN PART. It is GRANTED as to qualified immunity for Defendants Villarosa and Strauss for Plaintiffs' freedom of assembly claim (Count 9). It is otherwise DENIED.

IT IS FURTHER ORDERED that Defendants must pay Plaintiffs nominal damages in the amount of $1.

IT IS FURTHER ORDERED that Defendants are ENJOINED from revoking Plaintiffs' RSO status at Wayne State University based on Plaintiffs' religious criteria for student leadership selection.

Finally, IT IS ORDERED that Defendants shall respond to the court's consideration of summary judgment as to Plaintiffs' claims under the Michigan Constitution (Counts 16-19) and the Equal Protection Clause (Count 10) by **April 26, 2021**. Plaintiffs may reply by **May 10, 2021**. Parties may submit a stipulation in lieu of briefing.

s/Robert H. Cleland                         /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  April 5, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 5, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner                              /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\19-10375.INTERVARSITY.CrossMotionsforSummaryJudgment.RMK.RHC.4.docx